### FARMERS' LOAN & TRUST CO. *v.* OREGON RY. & NAV. CO.

(Circuit Court, D. Oregon. April 28, 1896.)

WAREHOUSEMAN—NEGLIGENCE.

While certain of plaintiff's goods were lying in defendant railway company's freight depot,—their transportation having ended, and the railway company being responsible for them as a warehouseman,—a drayman brought a carboy of sulphuric acid to the depot, for shipment, and unloaded it there. All the defendant's employés who were about the depot were engaged in other parts of it, and, though it was defendant's rule that carboys of acid should not be placed inside the depot, there was no one present to enforce the rule, or see what the drayman did with the carboy. He placed it inside the depot, near a spot where the floor was saturated with oil; and, in consequence of a leak in the carboy, an explosion occurred, which set fire to the depot, and plaintiff's goods were destroyed. *Held*, that defendant was negligent in failing to exercise a reasonable supervision over the storage of articles in its depot, and in the care of the building where its patrons' property was stored, and, accordingly, was liable to plaintiff for the value of his goods destroyed.

This was an intervening petition filed by P. F. Collier, in the suit of the Farmers' Loan & Trust Company against the Oregon Railway & Navigation Company, to recover damages for the loss of certain goods of the intervener.

Wallis Nash and J. F. Boothe, for petitioner.
Cox, Cotton, Teal & Minor, for respondent.

BELLINGER, District Judge. The petition claims damages for the loss of two cases of books destroyed in the fire by which the freight depot and station of the Oregon Railway & Navigation Company at Baker City was destroyed on August 12, 1895. The goods were shipped from Portland by the company's railroad to Baker City, consigned to one T. A. Frischkorn. They arrived at Baker City on August 9th, and were thereupon placed in the warehouse portion of the depot. On the morning of the 10th a postal card was sent to the consignee, stating that the books were at the warehouse, awaiting delivery, and that storage would be charged thereon after the expiration of 48 hours. On the afternoon of August 12th the warehouse in which the books were stored was destroyed by fire. There were employed there at the time a station agent, telegraph operator, and two warehousemen. The following stipulation of facts as to the fire is filed in the case:

"On the afternoon of the 12th of August, 1895, the two warehousemen employed at the said depot were engaged in loading a car of merchandise with freight from said warehouse; said car being situated on that side of the warehouse nearest the main track of the railway, and near the west end of the said depot. That, while said warehousemen were so engaged, a drayman by the name of Breon backed his dray up to the platform of the depot, on the side of the depot away from the main track, and at the east end of said warehouse, and unloaded from said dray one carboy of sulphuric acid, and placed the same inside of the warehouse, and near the door which he had entered. That thereupon the said drayman returned to his dray for the purpose of unloading a barrel of beer, also upon said dray, and, after so doing, intended to go to the office and obtain a shipping receipt for said merchandise. That said Breon, if called, would testify as follows: 'That said carboy was handled as carefully as possible, and that I was not aware that the same was in a leaky condition; that, immediately after placing the carboy in the warehouse, I started to return to the wagon, intending to put the barrel of beer in the warehouse, and when outside of the warehouse door an explosion of some kind occurred near by, the force of which knocked me down on my face; that I do not know what caused the explosion, neither do I know just where it took place, but am certain that it occurred in the warehouse, in the vicinity of the place where I put the acid; that there was no one connected with the warehouse near the place where the acid had been placed at the time the explosion occurred; that I put the acid in the warehouse, expecting to get a shipping receipt for it and the barrel of beer, after getting them both placed in the warehouse.' * * * It is further stipulated that H. C. Bowers, the station agent of the respondent at Baker City, if called, would swear that 'it [the said carboy] should have been left outside. It is not customary to put carboys of acid, or tanks of acid, in the warehouse. We were not aware that it was being stowed in the warehouse. Both the warehousemen were at far end of warehouse, unloading car of merchandise, when explosion occurred, and were not aware of the fact that carboy was being put in the warehouse. The floor where we pile our way freight was not saturated with oil, but on the other side of the door we had used the place to store our oil and fill lamps before the depot was used for handling freight; and it is supposed that the carboy had been broken in handling, and that some of the acid ran out on the floor, to where it was saturated with oil. I do not think there was any one around the depot that was aware of the fact that acid would explode when applied to oil. We have handled a great deal of it here, and, while we were always very careful to keep it away from other freight, more on account of its eating qualities than anything else, as it would destroy 'most anything it came in contact with, but we had not thought of an explosion. * * * I did not learn until the following day that the acid had been left in the warehouse. I had just stepped into the office, and was standing at a counter only a few feet away when it occurred.

I ran around to see what it was when the flames burst out. I then ran to hydrant across the track, to get out hose and try and put fire out, but we could do nothing. The depot was all on fire, and so hot, in two or three minutes, that we could not get anywhere near the depot. The flames seemed to have been thrown in every direction.'"

The transportation of these goods had ended, and the liability, if any, of the company, is that of a warehouseman. I am of the opinion that the fire was the result of the negligence of the company, or of its servants, for which it is liable to the petitioner. I reach this conclusion upon the following consideration: The company is bound to the exercise of ordinary care, and this requires a reasonable supervision over the storage of articles in its warehouse, and care of the building in which the property of its patrons is stored. There was not such supervision in this case. Whether this was due to the negligence of the station agent, or to the failure of the company to provide a sufficient number of employés for the purpose, is not clear. The two warehousemen were actively engaged in their duties next the main track at the west end of the building. The carboy of acid was unloaded and placed in the depot at the opposite side of the building, near the office in the east end of the building. If the duties of the station agent and operator were so engrossing that neither of them could take notice of those who were going in and out of the building, or of what was going on at the opposite side and end of the building from where the warehousemen were at work, then a larger force should have been employed. It is argued that the duty to guard against the consequences of another's negligence only exists when such negligence is known, that the company is not required to anticipate negligence in others, and that, therefore, the company cannot be made responsible for the negligence of the drayman in putting the carboy of acid in the building. But such an application of this principle would abandon the goods of patrons to the chances of being stolen or destroyed through the wantonness of others. It would absolve warehousemen from any duty to care for goods committed to them, so far as danger of loss or injury from merely human agencies are concerned. The Nitroglycerine Case, 15 Wall. 536, is mainly relied on to defeat petitioner's right to recover. In that case the defendants were expressmen who had received in New York a box containing nitroglycerin to be carried to California. There was nothing in the appearance of the box to excite any suspicion of the character of its contents. It was received and carried in the usual course of defendants' business. While in the defendants' possession at San Francisco, the nitroglycerin exploded, causing damage to premises occupied by other parties. The court held that there was no negligence on the part of the defendants in receiving the case, or in their failure to ascertain the dangerous character of the contents of the package in question; that it is only when there is good ground for believing that packages offered for carriage contain something of a dangerous character, arising from the appearance of such packages, or other circumstances tending to excite suspicion, that the failure to examine is a ground for an imputation of negligence. This principle does not relieve

the carrier from the duty of exercising any care in the receipt of packages for shipment or storage. It simply defines the degree of care required under the circumstances of the particular case. Otherwise the carrier may leave his warehouse open to the ingress of whoever may come, and to the storage of what chance may bring, as was done in this case. If a bailee leaves goods exposed so that they are liable to be stolen, and they are stolen, he cannot say in his defense that he had a right to rely upon the presumption of honesty in others. No more can he leave his warehouse open, without supervision as to what is stored therein, and, when damage results from the storage of dangerous articles, say that he had a right to rely upon the presumption that those who brought articles for storage would not be negligent. Such is not the conduct of a reasonable man "guided by those considerations which ordinarily regulate the conduct of human affairs." The testimony of the station agent is that it is not customary to put carboys of acid or tanks of acid in the warehouse, that it should have been left outside, and that they were not aware that it was being stowed in the warehouse. All of which goes to show that any care, however slight, on the part of the person having the warehouse in charge, would have prevented the accident by which the petitioner's property was destroyed. In the Nitroglycerine Case the defendants did not know the character of the package received by them, but this want of knowledge was not the result of indifference as to what they received. They were deceived by the innocent appearance of the package. They relied upon this appearance, as they had a right to do under the circumstances. In this case the defendant did not see the destructive package, nor know that it was being stored. It abandoned the safety of the property in its charge to the chance that all the persons desiring to store packages in its warehouse would exercise reasonable care as to the dangerous character of what was stored by them. This was an omission to do what a reasonable and prudent man would, under the circumstances, do, and is negligence. The petitioner is entitled to recover his damages. These will be the actual cost to him of replacing the property destroyed at Baker City.