### THE SAN GUGLIELMO.

(District Court, S. D. New York. April 12 and 16, 1917. On Application for Retrial, etc., May 14, 1917.)

1. SHIPPING ☞141(1)—DAMAGE TO CARGO—LIABILITY OF VESSEL—NEGLIGENT STOWAGE.

A steamship, on a voyage from Naples and other Italian ports to New York, carried in its cargo some 5,800 baskets of garlic, which is of a character to generate heat. The bills of lading exempted the ship from liability for damage occasioned by "heating, decay, * * * or any loss or damage arising from the nature of the goods." Of the garlic, 3,800 baskets, with other food products, were stowed in a deep water-tight tank in the No. 4 hold, which extended from the bottom of the vessel to a lower deck, with only two small openings at the top, affording little ventilation. The quantity of cargo stowed in the tank was such as to fill it to its utmost capacity and require close packing. On arrival, the garlic in the tank was found to be in a damaged condition, and it had damaged the other cargo stowed therein. The evidence showed that it was in good condition when shipped, and that other shipments made about the same time, and the portion of this cargo which was stowed in another hold, arrived in good condition. *Held*, that the damage was due to negligent stowage, and that the ship was liable therefor, notwithstanding the exemption in the bills of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497, 499.]

2. SHIPPING ☞141(1)—DAMAGE TO CARGO—LIABILITY OF VESSEL—NEGLIGENT STOWAGE.

A carrier, who accepts goods of a nature which requires special care in their stowage, must exercise such care, and, failing to do so, is liable for

---
☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the damage caused thereby, even where the character of the damage is within the exception from liability contained in the bill of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497, 499 ]

3. SHIPPING ⬤⇒142—DAMAGE TO CARGO—LIABILITY OF VESSEL—NOTICE OF CLAIM.

A provision of bills of lading that the carrier shall not be liable for any loss or damage, or for any claim, however arising, "of which notice is not given before removal of the goods and amount and particulars of claim given within eight days after receipt of goods," does not require notice in formal language before removal of the goods, and was sufficiently complied with in that respect, where verbal complaint was made to the master of the ship or to the superintendent of the steamship company, and the damage to the goods was obvious and was known to them; but such notice is effective only as to the class of goods of which complaint was made.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 496.]

4. SHIPPING ⬤⇒142—DAMAGE TO CARGO—LIABILITY OF VESSEL—NOTICE OF CLAIM.

Where the consignor under such a bill of lading made complaint of the condition of the goods before removing any of them, but removed some of them, leaving the remainder, which were condemned and destroyed by the board of health, the fact that he made no claim in writing within eight days thereafter does not preclude him from recovering for the goods which were not removed, as to which no notice was necessary.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 496.]

5. SHIPPING ⬤⇒110—DAMAGE TO CARGO—LIABILITY OF VESSEL—NEGLIGENT STOWAGE.

A custom of stowing cargo in a particular part of the vessel never can be justification for stowing more of a cargo there than all of the conditions, in their relation to physical surroundings, will justify.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 420, 421.]

In Admiralty. Suits by Jacob A. Kirsch, by P. Pastene & Co., Incorporated, and by Nathan Kronman against the steamship San Guglielmo. Decrees for libelants.

Henry L. Franklin, of New York City (Frank V. Barns, of New York City, of counsel), for libelants.

Kirlin, Woolsey & Hickox, of New York City (Cletus Keating, of New York City, of counsel), for claimant.

MAYER, District·Judge. These actions were brought by libelants, owners of various shipments of garlic, peppers, oregano, and canned tomatoes, carried by the steamship San Guglielmo from Naples, Italy, to New York, in June, 1915, to recover damages sustained by them because of injury suffered by the cargo while in transit. The libels are substantially alike. Each alleges shipment in good order and condition and delivery in damaged condition. Among other faults alleged, each libel charges that the damage was due to negligence in the loading and stowage of the cargo.

' The shipments were made under several bills of lading, all of which are alike. The goods shipped were "in apparent good order and condition." Claimant denied that the cargo was in good condition when shipped, and made various other contentions. However, the case, as

developed by the proof, presents only two defenses arising out of the following provisions of the bills of lading:

First. Claimant relies upon the following exception:

"Weight, gauge, quantity, contents, condition, quality and value unknown. * * * Carrier shall not be liable for loss or damage occasioned by causes beyond his control, by perils of the sea, or other waters, * * * or for loss or damage occasioned by *heating,* frost, *decay,* putrefaction, rust, *sweat, change of character,* spray, drainage, *breakage, leakage,* loss of contents, * * * *or any loss or damage arising from the nature of the goods,* or insufficiency of wrappers or packages *or damage arising from other goods by stowage or contact with, or from leakage,* smell of putrefaction therefrom, provided due diligence is exercised in the stowage of the cargoes."

Second. Claimant contends that libelants failed to comply with section 5 of the bill of lading, which provides:

"The steamship company shall not be liable for any loss or damage, * * * nor for any claim, however arising, of which notice is not given before removal of the goods and amount and particulars of claim given within eight days after receipt of goods. * * *"

The San Guglielmo is a modern steel steamer built in 1911 especially for the Italian fruit trade. She is 6,458 gross tons and is rated 100–A–1 in Lloyds. She loaded at Naples, Italy, on June 6, 7, and 8, 1915, and part of her cargo was food products, among which were garlic, cheese, preserves, oil, wine, tartar, lemons, etc. Leaving Naples and calling at Messina, the steamship loaded about 20,000 boxes of lemons and a large quantity of macaroni and other cargo. Proceeding thence to Palermo, more lemons and food products were loaded; the last of the loading being done on June 12th. The damaged cargo for which recovery is sought was all loaded at Naples. It consisted of 1,212 baskets of garlic, 109 baskets of peppers, 102 baskets of oregano, and 452 baskets of tomato sauce shipped to libelant Kirsch, 250 baskets of garlic shipped to libelant Nathan Kronman, and 917 baskets of garlic shipped to libelant P. Pastene & Co., Incorporated.

Some of the cargo of foodstuffs was stowed in No 1 hold, and some in the deep tank in No. 4 hold. The testimony shows beyond question that No. 1 hold was a proper place in which to stow cargo of this character, and no complaint is made in respect thereof. Libelants contend that all of the cargo consigned to them which was damaged was negligently stowed in the deep tank in No. 4 hold.

The first question presented by the testimony is whether or not the cargo in controversy was in good condition when delivered to and accepted by the San Guglielmo for carriage to New York. A commission was duly issued, and the testimony of various witnesses was taken at Naples. From the testimony it appears that the witnesses for libelants there examined were intelligent and experienced men.

Foglio, Palmieri, and Russo were growers and curers of garlic, who sold their product for export. These men were experienced in raising, harvesting, and curing garlic, and they testified that the Naples garlic is sown in September and October, ripens in April and the early part of May, is then harvested, stemmed, and left to dry, and that the drying takes from 8 to 10 days. Thereafter the garlic is taken to the warehouse, where it is packed in baskets. According to this testimony,

the usual method of harvesting, curing, and packing was followed with the garlic in question.

Bonacci is a dealer in produce on his own account, and apparently an experienced exporter in a substantial way of business. He shipped to Kirsch the 1,212 baskets of garlic and 109 baskets of peppers. He stated that he examined these baskets, and that "they were in perfect condition, and could surely support an ocean voyage of about 30 days, if well stowed." He further stated that on several occasions he had exported Naples garlic which was plucked in May, had never received any complaints, and that the garlic shipped to Kirsch was in just as good condition as that sent forward by him on other occasions. He was present up to the time the goods were taken from the lighters and lifted on board the steamer; but did not know in what part of the steamer the merchandise was being stowed. He further testified on cross-examination that he had shipped May garlic for export to the United States, which arrived in the United States in the month of June, and that he saw the garlic discharged upon its arrival in the United States, and that some of the voyages on which garlic cargo was carried took 2 weeks, and others 3 weeks. He also referred, as did Foglio, to a shipment of garlic on the Patria, a vessel with tonnage a little over that of the San Guglielmo, but, in general, similar to other steamers of this character plying between Naples and the United States. He said that he had never received any complaint in regard to the Patria garlic.

Kirsch corroborated Bonacci in this regard, testifying that the Patria arrived in New York about 10 days before the San Guglielmo, and that she delivered her garlic in good condition. Kirsch received another shipment from the same purchase, which arrived by another steamer about 10 days after the San Guglielmo. Kirsch is an experienced and large importer of products of this character, and impressed me favorably as a truthful and clear-headed man.

Barbati and Maffei were exporters, who sold and shipped some of the garlic in controversy, and corroborated Bonacci's testimony in essential respects. Stabile, the broker who effected the sale to the exporters, gave further testimony along the same line. Niola, a broker, and Barbati (as well as Bonacci), testified that the 109 baskets of peppers and 112 baskets of oregano were in good condition, well packed, and able to stand a voyage of 30 days. Stabile and Barbati testified that the 452 cases of tomato and tomato sauce were in perfect condition, properly packed, in new well-dried cases, free from soil and stain.

Without further detail, it amply appears from the testimony that the garlic was in good condition *when placed aboard the vessel.* There is no contradiction of this fact by any fact testimony, and the experience with the Patria shipment is a strong circumstance in support of the conclusion that the garlic was dried and properly cured. There is no proof to the contrary from any person on the vessel or at the port of shipment, but only inference in the nature of speculation, and not by way of deduction from proven facts. In answer to the suggestion that the garlic was shipped too soon after the harvesting, the testimony of

several of the witnesses at Naples shows that like shipments had been made for many years without difficulty or complaint.

[1] It may be assumed that stowage of garlic in the deep tank was the custom at the port of Naples, and, generally speaking, with a small cargo, might not have been negligent. The question in the case, however, is whether the particular shipments here under consideration were negligently stowed. The heat-generating characteristics of garlic were well known to the officers of the vessel. Obviously it is the kind of cargo which those in charge of the vessel desire to handle in such manner that the odor will not affect other food or fruit cargo. It is for this reason, apparently, that the deep tank on the San Guglielmo was utilized so far as possible. This tank was a water-tight compartment, capable of being used as a ballast when the ship sailed in ballast, and was situated in the forward part of No. 4 hold. The deep tank was fully described by the master of the vessel and by Capt. Bagger, an expert for libelants, who examined it in November, 1915, and drew rough drawings to show its construction and surroundings. The San Guglielmo had five tanks, and the deep tank went down to the bottom of the vessel; the top of it being a lower deck. Entries to the deep tank were two holes, each 7x9 feet. There was no ventilator, although there were two pipes, called "vent pipes," which ran from the top of the tank up to the shelter deck, where they turned downward to the deck, with openings 4x6 inches. When the hatches were put on the tank and water was taken in, these vent pipes furnished an exhaust for the air, which was forced out of the tank by incoming water. The forward part adjoined the engine room. Along the bottom ran two tunnels, each 8x6 feet. The capacity of the tank was 17,880 cubic feet cotton space, or 18,270 cubic feet grain space. The baskets of garlic, according to the master, each required about 5 cubic feet; the peppers and oreganos about 6 cubic feet.

On the trip in question the San Guglielmo carried in all 5,875 baskets of garlic, of which 3,807 were stowed in the deep tank; the remainder being stowed in No. 1 hold. In other words, these 3,807 baskets of garlic, each occupying 5 cubic feet, would require 19,035 cubic feet. In addition, the 109 baskets of peppers and the 112 baskets of oregano; also stowed in the deep tank, requiring 6 cubic feet each, would take up 1,326 cubic feet. The testimony did not show the size of the 149 bags of tartar in the deep tank, but, even excluding these bags, we find a cargo requiring 20,361 cubic feet stowed in a space of 18,270 cubic feet, in a compartment having only a small opening at the top. The ventilation of the deep tank under favorable circumstances would not be very great, but here was a situation where these units of a heat-generating cargo were packed so closely that the conclusion is well justified that there was no opportunity for currents of air to get into the deep tank and circulate into the cargo. If the hatches of the vessel were open practically throughout the voyage, as testified to by her officers (the only time any were closed being one day when the promenade deck hatch was closed), it must nevertheless be apparent that packing or squeezing a cargo of this character in this way inevitably led to the production of the heat which ultimately destroyed the cargo in the deep tank shipped to these libelants.

The entries in the vessel's cargo book show that the only shipments of garlic carried on the San Guglielmo from July, 1914, to June, 1915, were as follows: 171 baskets in November, 1914; 500 baskets in September, 1914; and 200 baskets in December, 1914. The shipment of 200 baskets was carried in No. 1 hold, and it is not quite clear whether the other two shipments were carried in the deep tank or not; but, assuming that the larger shipment of 500 baskets was carried in the deep tank, there certainly is a vast difference between carrying such a cargo thus stowed and a cargo of more than seven times that number of baskets of garlic, plus baskets of peppers and oreganos. In other words, it is the difference between occupying 2,500 cubic feet and 20,361 cubic feet, and, more than that, the lesser cargoes were carried in the fall and winter months, while the cargo under consideration was carried in June.

Counsel for claimant has violently attacked the testimony of libelants' experts, Bagger and Connor. It is true that neither of these men has actually sailed as master of vessels similar to the San Guglielmo, but both have had considerable experience in looking over vessels after they have arrived in port. However, it is not necessary to analyze expert testimony, because the facts speak for themselves, and there can be no question as to the substantial correctness of Capt. Bagger's rough drawings. Capt. Bagger has testified on several occasions before in trials held before me, and I have never had any reason to doubt his veracity on a question of fact or his sincerity when venturing an expert opinion. When, therefore, he and Capt. Connor (a reputable man, now a surveyor for the New York Board of Underwriters) said, in effect, that there was not ventilation, there was much basis for their assertion in that regard.

Claimant endeavored to meet the testimony adduced on behalf of libelants by the testimony of various witnesses who, claimant urges, showed that damaged garlic was taken out of hold No. 1; the point being that, if garlic came out of hold No. 1 damaged, then the fault was with the garlic which came out of No. 4 hold deep tank, and not with the stowage. This contention requires an analysis of the testimony upon which it was based. In the first place, it is clear beyond question that the garlic for which libelants made claim came out of the deep tank. Claimant did not produce any consignee who had made any claim in respect of garlic which came out of No. 1 hold.

It was urged, however, that there was testimony to show that some garlic consigned to a firm known as Vitelli & Son came out damaged from No. 1 hold. This contention is based upon the following: It appears from the delivery book of the steamer that 500 baskets of garlic were consigned to the Vitelli firm, of which 388 were condemned, and the remaining baskets, or 112, were delivered to Vitelli. Counsel for claimant stated:

"It does not appear from what part of the steamer these baskets, or any part of them, were discharged."

It will thus be seen that there was no complaint in respect of 112 baskets of the shipment to Vitelli. The 388 damaged baskets consigned to Vitelli could very easily have been, and doubtless were, stowed in the deep tank, as can be demonstrated by simple mathematical compu-

tation. The total amount of baskets of garlic consigned to these libel-
ants was 2,379, as follows: 1,212 to Kirsch, 250 to Kronman, and 917
to Pastene. The total number of baskets stowed in the deep tank was
3,807. Subtracting 2,379 from 3,807, we have 1,428 baskets of garlic
consigned to persons and firms other than libelants, and the damaged
Vitelli garlic was undoubtedly a part of these 1,428 baskets. The
testimony of Morelli. who was a driver for libelant Kronman, fully
confirms this view. He testified that he saw some garlic being unload-
ed from the front part of the ship, and that the appearance was "very
good." Upon being asked whether he saw any of the marks to iden-
tify the garlic that he saw coming out of the front part of the ship,
he says he did not, but that he knew the drivers who do work for certain
firms, and that there were some there from Vitelli. It was apparent
that some of this garlic coming out of the front part of the ship was
among that consigned to Vitelli. Upon being asked as to the appear-
ance of that garlic, he said, "Good."

It will thus be seen that, in a manner not perhaps appreciated at the
trial, Morelli, who was obviously a truthful witness, unconsciously cor-
roborated the contention of libelants. If all of the Vitelli cargo had
come out of the deep tank, then it would have been difficult to under-
stand how part could be good and part bad. If all came out of No.
1, there might be some support for the contention of claimant that the
garlic was not in fit condition when shipped. But, from what has been
outlined above, it will readily be seen that the logical conclusion from
the testimony is that the good Vitelli garlic, which Morelli saw com-
ing out of the front part of the ship, was the garlic contained in the
112 good baskets, and that the 388 baskets condemned by the board
of health must have come out of the deep tank.

I asked some questions of Bonizzi, the superintendent of claim-
ant's pier, the purpose of which was to aid me in determining this ques-
tion here in controversy. Bonizzi testified that in No. 1 hold there were
cheese and beans, "or something like that, all merchandise," and that, if
anything had gone wrong with the No. 1 hold garlic, the odor would
have gone into some of these other products. Bonizzi stated, however,
that he never received any complaint from the consignees of these other
products, and had "never heard anything—never had any claims or any-
thing." Upon being pressed to name a single consignee of garlic who
complained in respect of garlic coming out of No. 1 hold, he was un-
able to do so. But he did remember very distinctly who complained to
him in respect of the garlic coming out of No. 4 hold. Further, to
support the contention as to the unfit character of the garlic, claimant
produced several other witnesses.

Trieamo was the foreman stevedore for claimant. His testimony
was utterly worthless. This is demonstrated by the record and was
apparent in the courtroom. This man is doubtless an excellent steve-
dore, but, to put the matter euphemistically, his recollection was com-
pletely at fault. He testified that there was very little garlic in No. 4
deep tank; that most of the garlic was in No. 1 and No. 2, and
"a little in No. 4." The conceded facts are entirely to the contrary.
His statement that there was some good and some bad cargo in both
holds No. 1 and No. 4 must be completely rejected. He testified that

he had seen about 6,000 crates or baskets of garlic discharged from the deep tank of this same vessel on some four previous trips, but was unable to state the largest number discharged on any one trip, or the times of these previous arrivals of the vessel. This testimony is flatly contradicted by the records of the vessel itself; but, even if accepted, it proves that the San Guglielmo, on the trip in question, carried in the deep tank on this one journey a number of baskets equivalent to more than 60 per cent. of what was carried in the aggregate on the four preceding journeys. In respect of custom, his testimony amounts to no more than a statement that an amount of garlic fitted to the circumstances may be properly stowed in this deep tank; but it is of no value as showing that it was customary to stow the large amount carried in the deep tank on this voyage.

Monahan was claimant's delivery clerk, and was on the pier at intervals while the steamer was being discharged, and saw part of the cargo of garlic when being discharged. He testified on direct that he saw damaged cargo discharged from both No. 1 and No. 4 hatch. In answer to the questions of the court, however, he stated that he did not examine any of the baskets, did not look inside of them, and could not say whether they were wet. He simply saw some baskets with a blackish appearance. He did not notice any steam coming out of any of the baskets, and, in brief, his testimony amounts to nothing.

Giacaloni, examined through an interpreter, was the head sorter of claimant. His fragmentary testimony made no impression whatever upon me; I did not believe it at the time, and I do not believe it now. It seems utterly absurd to suppose that any of the garlic which came out of deep tank could have been in good condition, and yet Giacaloni so testified. Further, he testified that on a previous shipment he had seen 1,000 baskets come out of the tank of this vessel, and this has already been shown to be contrary to the ship's records. When asked to tell of any instance when he saw garlic discharged from this vessel, the time when it was, and the amount that came out of the deep tank, before the shipment in question, he answered, "I don't remember."

Bonizzi, the superintendent above referred to, was positive that during a period of the six months preceding June, 1915, the San Guglielmo had brought over a cargo of garlic on four occasions, carrying "sometimes 3,000, 4,000, or 15,000, 18,000, and 20,000 baskets, and that it carried in No. 4 hold 4,000 or 5,000 baskets." This testimony was absurd and regretfully careless in the light of the facts. His statement that bad garlic came out of No. 1 hold cannot be accepted. It was indefinite, and, in view of his testimony as to previous shipments, it lost any credibility which otherwise it might have had.

Giannoni, the expert called by claimant, is now a solicitor for the Morse Dry Dock & Repair Company. He has been a sea captain in the trade between Italy, the Mediterranean, and the United States, and, undoubtedly, is a capable and truthful man. His testimony as to general conditions and the stowage of cargo of this character in deep tanks generally and in this deep tank, as a broad abstract proposition, need not be questioned. He himself had sailed on two vessels which did not have deep tanks, but had fore and aft peaks. His

knowledge, so far as concerns deep tanks, like that of Bagger and Connor, is largely obtained from sources other than his own experience and from an examination of the San Guglielmo, and he admitted, in answer to the court's question, that what happens "depends on the cargo." I am unable to follow him in the conclusion that there would be no differences of practical matter in stowing cargo in No. 1 hold or No. 4 hold deep tank, and that both places would be equally good in view of the different ventilation means and general "layout."

But, without further analysis, it is enough to say that there is nothing in Capt. Giannoni's testimony which will justify the conclusion that it is customary or proper closely to pack such a cargo in the deep tank as has been here described.

Finally, it is an illuminating fact that Capt. Figari testified that the cargo of lemons taken on at Messina and Palermo were not put in the deep tank:

"Q. The lemons were divided into 1, 2, 3 and 4, but not in the deep tank? A. The lemons were put on the top. Sometimes we put them between deck. Q. Why? A. *Because the lemons want ventilation. Fruit needs ventilation. Lemons must be well ventilated.* Q. Still you put them in deep tank No. 4? A. No, there is no lemons in deep tank No. 4. We filled up the tank with oil and wine, and there is no room left for the lemons."

[2] Although counsel have cited many cases, the law is clear enough. The exception in the bill of lading casts upon libelants the burden of establishing by a preponderance of evidence that the damage was due to negligence on the part of the ship, and it is equally well settled that a carrier, who accepts goods of a nature which requires special care in their stowage, must exercise such care, and, failing so to do, is liable for the damage caused thereby, even where the character of the damage is within the exception from liability contained in the bill of lading.

I am of opinion that libelants have fully borne the burden cast upon them, and that there is no doubt that the garlic was in good condition when shipped, and that so much thereof as is here concerned was placed in the deep tank and there negligently stowed.

[3] There remains for consideration the provision as to notice, quoted supra. The damaged condition of this cargo was notorious, and the subsequent condemnation of some of it by the board of health could not have left any doubt in any one's mind as to its character.

As to Kirsch: When Kirsch discovered the condition of the baskets, and found the garlic was boiling and hot, he immediately saw the captain, who gave him no satisfaction. Such goods as Kirsch removed, he finished taking away on July 8th, and notice, as required under the bill of lading, was given within eight days after the receipt thereof, to wit, on July 14th, in a letter addressed by Kirsch to Pierce Bros., Incorporated, the receipt of which is admitted. Bonizzi was fully aware of the damaged condition of much of the cargo on the vessel.

As to Kronman: One hundred baskets of garlic were delivered on July 8th, and the remainder of the Kronman goods were condemned by the board of health. Kronman's driver complained to Bonizzi before any goods were removed from the dock, and this Bonizzi ad-

mits. Greenberger, who is connected with the Kronman firm, testified that he sent a letter, with statement inclosed, containing the amount and particulars of the Kronman claim, on July 9th. Receipt of this letter was denied by claimant, and there is no reason to doubt the accuracy of claimant's records; while, on the other hand, the testimony fails to satisfy me that the letter prepared by Greenberger was mailed to or received by claimant.

As to Pastene: Bonizzi admits that Pastene's driver complained to him, and told him the garlic was in bad condition, and Bonizzi verified that fact. Pastene, whose goods were delivered on July 7th and 8th, also within the eight days required under the bill of lading, to wit, on July 13th, duly notified claimant of the amount and particulars of the claim, and receipt of this notice is admitted.

The sole question is whether what was done by libelants constituted the notice required under the bill of lading before removal of the goods. The authority relied upon by claimant is The Persiana, 185 Fed. 396, 107 C. C. A. 416, decided by divided court. In that case:

"The vessel discharged at a dock in Brooklyn, and many bales of wool consigned to libelants were taken away in good order. The particular lot from this part of hold No. 2, including the damaged bales, was placed on the dock on or before May 28, 1907. Libelants gave a lighterage company an order for it for transportation to the Jersey City Stores. The lighter came to the dock and began to load this wool late in the evening of May 28th, and finished the next day, when the lightermen receipted for the wool '34 oil stained' and carried it to Jersey City. The following day (May 30th) was a holiday, but on May 31st the Jersey City Stores notified libelant Lissberger (who had bought Busk & Jevons shipment) that a number of bales were oil damaged, and on June 1st, upon receipt of this notification, he gave written notice of claim to the Tweedie Trading Company, the time charterer of the vessel. Busk & Jevons, being informed of the damage by Lissberger, gave similar notice on June 3d, a Monday."

It will be seen from the foregoing that there was no notice of any kind to the charterer or officers of the vessel, and that a considerable part, at least, of the cargo was taken away in good order. In the case at bar, however, there was on behalf of each libelant a distinct conversation, either with the captain of the vessel or the superintendent of the steamship company, prior to the removal of the goods, and there is no denial of the fact that the damaged condition of these particular goods was fully known to these officials.

Judge Lacombe, in the prevailing opinion in The Persiana, points out that bills of lading may properly contain some reasonable requirements that notice of a claim be given, "so that the shipowners may know, not merely whether there is damage for which no demand may ever be made, but whether any claim for damages is asserted by the consignee, so that the necessary investigation may be made while the goods are still under the control of the ship;" and Judge Coxe enlarges upon this subject in his dissenting opinion. In the case of the Kronman and Pastene goods, there is no question that such an investigation was made by Bonizzi, and, indeed, the damaged condition of the goods was obvious, and in the Kirsch case there is no question that this condition was obvious to the captain of the vessel. It would certainly involve a technical construction beyond all reasonable limits to say that this provision in the bill of lading placed upon the consignees

the duty of giving some kind of formal notice in formal language to the appropriate representatives of the vessel or its owners.

Of course, there may be many instances where it may be claimed that a few boxes or bales of a shipment were damaged, while the great bulk of the shipment is in good condition, and in such cases a casual observation by a consignee or his agents or employés to some minor employé of the steamship owners would not be compliance with this provision of the bill of lading. That, however, is not this case. The talks of Kirsch and the drivers of Kronman and Pastene were respectively with the captain of the vessel and the superintendent of the steamship company, and concerning goods known without question by these men to be in bad condition. The fact that the captain and the superintendent answered indifferently is a matter of no consequence. It seems to me that the conversations, as related in the record, in all the circumstances there disclosed, constituted the notice required by the bill of lading, and any other conclusion would make a mockery of this provision, and torture it into an instrument for the most indefensible kind of evasion by technicality, instead of a fair and reasonable protection to the shipowner.

[4] The only other question is whether Kronman is entitled to recover for those goods, which were left on the dock and later destroyed by the board of health. The argument here seems to be that, because Kronman's drivers took *some* goods, he took *all*. I am of the opinion, however, that there was no delivery to Kronman of the goods which remained on the dock and were in such wretched condition that the board of health found it necessary to condemn them. As to those goods, it seems to me that there never was any removal; hence no notice was required, and therefore the time for giving the notice has never begun.

It follows that the failure to send or receive the letter from the Kronman firm testified to by Greenberger is immaterial as to the goods remaining on the dock thus destroyed by the board of health, and consequently the Kronman firm is entitled to recover for those goods, but not for the goods which they removed from the dock. Galveston, Harrisburg & San Antonio Railway Co. v. Ball, 80 Tex. 602, 16 S. W. 441.

Each libelant may have a decree with costs in accordance herewith.

(April 16, 1917.)

In looking over my opinion dated April 12, 1917, I find that I was in error in regard to the 452 cases of tomato sauce. My attention while writing the opinion was so concentrated on the main proposition of the shipment of garlic that it escaped me that the 452 cases of tomato sauce were not stowed in the deep tank, but were in hatch No. 2. On the evidence in the case libelant Kirsch has failed to prove negligent stowage in this regard, and therefore cannot recover for these 452 cases of tomato sauce.

The decree will be prepared accordingly.

(May 14, 1917.)

Counsel desire to be advised as to whether my opinion is intended to indicate that libelant Kirsch may recover for damages to the peppers

and oregano. Libelant Kirsch, in my opinion, is not entitled to such recovery, for the reason that his conversation with the captain was confined to referring to the garlic, and, having omitted to refer to the rest of the cargo consigned to him, he cannot recover for the peppers and the oregano, under the authority of The Persiana, 185 Fed. 396, 107 C. C. A. 416.

### On Application for Retrial and for Leave to Take New Proofs.

This is an application for a retrial and for leave to take new proofs. I will deal with it in the order followed in the petition.

1. It is contended that the court erred in holding that there was not any damaged garlic which came out of No. 1 hold. Upon further consideration I am confirmed in my conviction expressed in my main opinion. The reference to the testimony of Kirsch at pages 6 and 7 does not change my view. All of the testimony of Kirsch must be read together, and it is quite clear that he did not see any damaged garlic so situated on the dock as to indicate that it came out of No. 1. He said that he saw some "marked N. K., *I believe*." This garlic he characterized as "fine." In other words, his testimony was that the garlic to which he was referring (to whomever it may have belonged) was in excellent condition. He did not state positively that the mark was "N. K." He merely used the expression "I believe," and he may very well have been mistaken.

I sufficiently analyzed the testimony of Morelli in my main opinion to render repetition on that score unnecessary. I repeat that the testimony of the witnesses for claimant on this question of No. 1 hold did not make a satisfactory impression upon me, and I have sufficiently covered that branch of the case in detail in my main opinion.

In respect of the calculation as to the amount of cubic feet occupied, etc., my discussion in the main opinion was illustrative. I can only be governed by testimony, and I cannot speculate outside of the record as to what in fact were the dimensions of each basket of garlic. Following is an extract from the testimony of Capt. Figari:

"Q. What were the sizes—dimensions—of the various baskets of garlic that were stowed in deep tank 4, as well as hatch No. 1? A. There were different sizes. Q. Were they 16 by 26 by 12? A. I don't know. I didn't take any measurements. Q. Will you give us your best judgment on it, or your best recollection, please? A. Whereabouts? I know there was some we calculate about 5 cubic feet. Q. For each basket? A. Yes. Q. And how large were the oregano and the peppers? A. They calculate 6 cubic feet for a basket."

From this testimony it may be that every basket was not five cubic feet, but while that might make a slight difference in calculation the result is the same, and that result is that the deep tank was overpacked for this kind of a cargo.

I do not see that the testimony as to the garlic of other shippers will help. How far such testimony would be admissible I need not now determine. This much is true, that such an inquiry would involve ascertaining by whom the garlic was shipped and under what circumstances, as well as all of the events in respect thereof which took place on the arrival of the vessel here.

As the case was earnestly tried by both sides, I wrote a somewhat full opinion, for the purpose of giving an outline of my reasons and conclusions. The ultimate fact, however, is that there is no direct testimony to contradict the overwhelming and convincing testimony that the garlic, when shipped, was in good condition. The effort to prove the contrary rests practically on inference. On the other hand, the physical condition surrounding the deep tank is such as readily to account for the condition of the garlic complained of.

[5] 2. Counsel repeats his contention that I have misconstrued the law in connection with the claimant's obligation. I fail to see that any argument is now advanced which has not already been carefully considered. I have read again my main opinion, and I do not see anything which I can add to the question of negligent stowage, except, perhaps, to repeat that the custom of stowing cargo in a particular part of the vessel never can be justification for stowing more of a cargo than all of the conditions in their relation to physical surroundings and location will justify.