## THE CALEDONIER.

Circuit Court of Appeals, Second Circuit.
January 7, 1929.

On Reargument, March 4, 1929.

Nos. 78, 79.

Loomis & Ruebush, of New York City (Homer L. Loomis and Glenn W. Ruebush, both of New York City, of counsel), for appellant.

Theodore L. Bailey, of New York City, for libelants appellees.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. ▮ Both appellees are cargo owners, who sued to recover for damages to their respective cargoes of bales of rabbit skins, claimed to have been sustained while being transported on a voyage from Antwerp to New York, arriving March 30, 1920. The bill of lading acknowledged receipt of all these bales in apparent good order and condition, and the evidence supports this claim. When the rabbit skins arrived, they were charred and wet, hot and steaming. Bales of rags in wet condition were stowed in the same compartment with the skins. The rags were stowed on top of and next to the skins. While it is disputed that the rags were in the same hold as the skins, we agree with the trial judge, who heard the witness, that such was the fact. It was bad stowage to put wet rags in the hatch about and on top of the skins, for it resulted in wetting the skins and heating them more than would be expected by the usual sweating, which does occur during an ocean voyage. The Lake Fontanet (C. C. A.) 288 F. 544; The San Guglielmo (D. C.) 241 F. 969; The Skipton Castle (D. C.) 223 F. 839; The Hudson (D. C.) 122 F. 96; Farmers' Loan & Trust Co. v. Oregon Ry. & Nav. Co. (C. C.) 73 F. 1003.

▮ But some of the skins were found to have been treated so that the ends had dried, and some were black and had the appearance of being scorched—"as if they had been put in an oven or kiln." How such damage occurred is not explained by the testimony, and the appellees have failed to establish by proof that the appellant was negligent with reference to this damage, or that it is responsible therefor. Of course, the appellees cannot be held for damages to the skins occurring after they had left the appellants' possession. The ship is liable for wetting and heating resulting from the stowing with the rags, but not for scorching. While it is testified that the bales appeared to be steaming in the hold, it would not follow from that fact that the skins were scorched there. It is incumbent upon the appellees to separate that damage which resulted from contact with the rags, from that which was the result of scorching, which resulted in the charred condition of some bales.

We are satisfied that the damage for which the appellees are entitled to recover resulted from negligent stowage.

▮ Another claim of liability rests upon the fact that the ship, taking the southern course, called at Bermuda for bunker coal. This is claimed to have been a deviation from the voyage. The ship answers that it had a protracted period of bad weather, and was obliged to replenish her fast-failing supply of coal. There is a dispute as to the tonnage carried, but in any case she did not have more than 797 tons of bunker coal, and this was insufficient for the voyage, under the most favorable circumstances, to carry her safely to New York. It resulted in the requirement of coaling at Bermuda, where 210 additional

tons were placed on board, and where there was a delay of five days. The weather encountered was what was to be expected in the month of March, and the log does not justify the claim of unusually severe weather. Where such weather is to be expected, the vessel may not be excused from her failure to be seaworthy for the voyage. The Charlton Hall (D. C.) 285 F. 640; The Goyaz (D. C.) 281 F. 259; The Rosalia (C. C. A.) 264 F. 285. She ordinarily consumed 41 tons per day, and on the voyage to Bermuda she averaged 36 tons daily. Upon arrival at Bermuda, she had 54 tons left, and on the voyage from Bermuda to New York she consumed 41 tons per day. She was 18 days at sea, and 36 tons per day required 648 tons, and with an allowance of 25 per cent. would make it 810—more than she had in her coal supply. The experience of the master on his previous voyages east and westward to and from Antwerp and American ports did not justify leaving Antwerp with this quantity of coal. ▉ When she left Antwerp on March 3d, we cannot say that the master undertook the voyage with knowledge and intent that the vessel would stop at Bermuda for coal, in which case it would be a deviation of the voyage. The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491; The Malcolm Baxter, 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901. Still the chance which was taken is sufficient to justify the claim of the appellee that the vessel was unseaworthy, and, in so far as this unseaworthiness thus created contributed to the damages, a recovery may be had. Hurlbut v. Turnure (C. C. A.) 81 F. 208.

▉ The liberty clauses of the bill of lading, providing that the ship shall have liberty to deviate for the purpose of saving life or property and with "liberty to call at intermediate ports," does not excuse the failure to make the vessel seaworthy for the entire voyage. This clause is not understood to permit a call which is not customarily a port of call for the vessel. The Sarnia (C. C. A.) 278 F. 459; Swift & Co. v. Furness Withy & Co. (D. C.) 87 F. 345; James Morrison & Co. v. Shaw, Savill & Albion Co., [1916] 2 K. B. 783. The clause does not release the ship from performance of any of her ordinary duties in preparing for the voyage, nor does it authorize the ship to sail voluntarily from the port of departure with a shortage of coal, and create the necessity for calling at intermediate ports not mentioned in the bill of lading and contrary to the customary course of the voyage. The Citta Di Messina (D. C.) 169 F. 472. The appellee has sufficiently established that by this prolongation of the

voyage, due to the shortage of coal and improper stowage, damage has resulted to its skins by unusual sweating and heating, and, as to this damage, it is entitled to full compensation.

The decree is reversed, with directions to the District Court to take further proof and proceed in accordance with this opinion.

### On Reargument.

▉ The valuation clause of the bill of lading provided: "Each package shipped hereunder does not exceed $100, * * * on which basis the freight is adjusted, and the carrier's liability shall in no case exceed the sum unless a value in excess thereof be specially declared and stated herein, and extra freight as may be agreed on paid." The rule of Reid v. Fargo, 241 U. S. 544, 36 S. Ct. 712, 60 L. Ed. 1156, and Union Pacific R. Co. v. Burke, 255 U. S. 317, 41 S. Ct. 283, 65 L. Ed. 656, makes this clause valid and enforceable in its terms. In the absence of evidence to the contrary, the bill of lading is conclusive of the fact that the freight rate charged to the shipper was adjusted upon the basis of the limited value. The shipper had the choice, if it wished, of paying a higher rate and being subject to less restricted recovery in case of loss. Hart v. Penn. R. Co., 112 U. S. 331, 5 S. Ct. 151, 28 L. Ed. 717.

▉ But it is argued that the valuation clause merely constituted an agreement between the shipper—Lloyd Royal Belge (but not the cargo owner)—and the carrier, Lloyd Royal Belge Soc. An. That the value of each package did exceed $100, and that to obtain a greater liability on the part of the carrier, the Lloyd Royal Belge as shipper should have specially declared and stated therein a greater value and paid extra freight, as may be agreed upon between the Lloyd Royal Belge Soc. An. as carrier, and the Lloyd Royal Belge as shipper. It is further argued that the Lloyd Royal Belge, as such forwarding agent of the merchandise, had no authority from its principals, the appellees, to accept a bill of lading containing the valuation clause here in question, and that the appellees are entitled in this libel against the carrier, to have the bill of lading construed as never having embodied any valuation clause whatsoever. It is clear that, even though the forwarding agent was not expressly commissioned to agree to a valuation of $100 per package, and was unaware of the true value of the merchandise, the ocean carrier would be entitled to the benefit of the agreed valuation clause. American Express Co. v. Daniel, 269 U. S. 40, 46 S. Ct. 15, 70 L. Ed. 154.

260

A different situation would be presented if the ocean carrier and the forwarding agent should conspire to violate the shipper's instructions and perpetrate a fraud upon him, or if the forwarding agent had positive instructions to declare a value greater than $100 and the ocean carrier knew that fact, and yet they both joined in agreeing upon the lower valuation; it would be collusive and fraudulent. But such is not the case here. The record is barren of any evidence of violation by the forwarder of any of the shipper's instructions, or of any suggestions of lack of authority in the forwarder to accept the bill of lading. The bills of lading measured the respective rights of the parties touching the shipment. The Delaware, 14 Wall. (81 U. S.) 579, 20 L. Ed. 779; Transmarine Corp. v. Levitt & Co. (C. C. A.) 25 F.(2d) 275. The provision is binding upon the shippers and limits the liability to $100 damage.

The decree is reversed, with directions to the District Court to take further proof and proceed in accordance with this opinion.