## THE MALCOLM BAXTER, JR.

### FRENCH OVERSEAS CORPORATION et al. v. FRENCH REPUBLIC et al.

Circuit Court of Appeals, Second Circuit. June 6, 1927.

Motion for Rehearing and Reargument Denied June 16, 1927.

No. 361.

1. Shipping ☞208—Petition to limit liability held properly denied, where vessel was unseaworthy when she commenced voyage, which could have been discovered by due diligence.

Where evidence sustained finding that vessel was unseaworthy when she commenced voyage, and that such fact could have been discovered by due diligence, petition to limit liability was properly denied; ship and owner being liable for consequences of breach of warranty of unseaworthiness of ship.

2. Shipping ☞207—Ship's condition and master's intention when voyage commenced, and not on leaving subsequent port, controls question of voluntary deviation.

Question of voluntary deviation, by turning from course and seeking port to make repairs, is determined by condition of ship and master's intention when voyage was commenced, and not when ship left another port thereafter.

3. Shipping ☞207—Seeking port for safety of crew, ship, or cargo for unseaworthiness, because of unfitness of structure, is not "voluntary deviation."

To seek a port of refuge, if in the judgment of the master, safety or best interest of crew, ship, or cargo requires it, because ship is unseaworthy from unfitness of structure, is not a "voluntary deviation."

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Deviation (in Law of Shipping).]

4. Shipping ☞207—Deviation is voluntary, if vessel leaves knowing she will be compelled to deviate for reasons other than structural unseaworthiness; "voluntary deviation;" "involuntary deviation."

If circumstances under which vessel leaves port are such that it must be known that she will be compelled to deviate for reasons such as shortage of fuel, the deviation is voluntary; but if ship leaves port in unseaworthy condition which includes one badly stowed, even if

condition was known, she does not voluntarily deviate if she seeks a port of refuge.

5. Shipping ☞207—Unseaworthy vessel held not to have voluntarily deviated in entering refuge port for repairs not contemplated at beginning of voyage.

Unseaworthy vessel, leaving port with intention to stop at another port for repairs not contemplated at commencement of voyage, did not voluntarily deviate in seeking such port for repairs.

6. Shipping ☞207—Breach of covenant of seaworthiness on sailing did not require discontinuance of performance of contract of affreightment.

Breach of covenant of seaworthiness on sailing did not require owner of vessel to discontinue further performance of contract of affreightment. .

7. Shipping ☞141(1)—Government "embargo" on sailing of vessels rendered performance of carriage contract impossible, and made bill of lading provisions respecting impossibility effective.

Where contract for ocean carriage was rendered impossible of further performance after making of repairs to vessel in port in which vessel sought refuge because of unseaworthiness, because of government embargo on sailing of vessels to war zone, bill of lading provisions respecting impossibility became effective; "embargo" being an unusual exercise of power by government, permanent restraint, making the sailing of the ship illegal and impossible, and rendering that illegal which had previously been legal.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Embargo.]

8. Shipping ☞131—Shippers held not entitled to damages because of embargo, but only to actual damages to cargo, and difference between value of goods when they should have arrived, and value if they had arrived after involuntary deviation.

Where, after making of repairs to vessel, which had involuntarily deviated because of unseaworthiness, vessel was prevented from proceeding further with performance because of government embargo, shippers held not entitled to damages against ship and shipowner because of embargo; nor could they recover prepaid freight, but only actual damages to cargo and difference between value of goods had they arrived at destination on straight voyage, had there been no interruption, and value of goods if they had arrived after the involuntary deviation.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the petition of the French Overseas Corporation, as owner of the schooner Malcolm Baxter, Jr., for limitation of liability. From a decree for claimants, French Republic and others, denying petition to limit liability, and for damages, petitioner and the

Maryland Casualty Company appeal. Reversed, with direction.

The three claimants appellees, Compagnie Franco-Indo-Chinoise, Engineering Timber Company, Limited, and the French Republic, shipped, respectively, starch, malt, lumber, tobacco, and steel billets on the schooner Malcolm Baxter, Jr., at New Orleans, in the latter part of July, 1917, for carriage to Bordeaux.

The schooner Malcolm Baxter, Jr., was purchased by the appellant after she had commenced loading for the voyage in question, and no officer of the appellant inspected the vessel before the voyage in question commenced, nor was she drydocked or subjected to an extensive survey.

On August 16, 1917, the schooner sailed from New Orleans. The schooner was towed down to the mouth of the Mississippi river, without meeting any severe weather, and came to anchor at Port Eads, where she remained until August 23, 1917.

After the schooner had been towed down the river to Port Eads and anchored, a leak forward was discovered and reported to her master. The master exercised his judgment and, instead of returning to New Orleans, proceeded on his voyage. The leak grew worse, and after he had sailed 658 miles, he put into Key West, on September 1, 1917, for repairs.

There was no shipyard available at Key West, and the schooner was towed to Havana, where repairs were made as fast as circumstances would allow. The repairs were completed and the schooner was ready to sail on January 9, 1918.

During the making of the repairs at Havana, and on September 29, 1917, the United States government levied an embargo, which prevented the schooner or any other sailing vessel from clearing for a voyage to Bordeaux or through the submarine zone. The embargo not being lifted, letters were sent to the shippers of the cargo in the United States, apprising them of the facts with reference to the embargo, and that the schooner would proceed to New York, and there deliver the cargo to them in accordance with the bill of lading.

The schooner sailed from Havana for New York, on January 14, 1918. After encountering a storm of considerable severity, during which she sprang a leak, which was controlled by the pumps, she arrived at New York on January 26, 1918, and delivered her cargo to the shippers.

But little damage from seawater was sustained by the cargo on the voyage from Havana to New York. The steel billets, lumber, and tobacco were transshipped by steamer to Bordeaux. The undamaged starch and malt were not transshipped, but were thereafter sold at New York.

From a final decree denying the petition to limit liability, and awarding damages to the claimants, the petitioner appeals.

Bigham, Englar & Jones, of New York City (D. Roger Englar, T. Catesby Jones, and James W. Ryan, all of New York City, of counsel), for appellant French Overseas Corporation.

Kirlin, Woolsey, Campbell, Hickox & Keating and Daly, Hoyt & Mason, all of New York City (Robert S. Erskine and Charles K. Carpenter, both of New York City, of counsel), for appellee French Republic.

Harry M. Zuckert and Rumsey & Morgan, all of New York City (Mark W. Maclay, Harry M. Zuckert, and John Tilney Carpenter, all of New York City, of counsel), for appellees Compagnie Franco-Indo-Chinoise and Engineering Timber Co., Limited.

Before MANTON and L. HAND, Circuit Judges, and CAMPBELL, District Judge.

CAMPBELL, District Judge (after stating the facts as above). [1] The evidence sustains the finding of the District Court that the Baxter was unseaworthy when she left New Orleans, and that such fact could have been discovered by due diligence. The petition to limit liability was properly denied. For the consequences of the breach of warranty of seaworthiness the ship and petitioner are liable.

[2] The master of the Baxter did not leave New Orleans with the knowledge that he would have to make a port for repairs, but honestly thought he could make the trip in safety, and tried unsuccessfully so to do. The leak was not discovered until after the ship had left New Orleans and anchored at Port Eads, and it was the condition of the ship and intention of her master, when she left New Orleans, and not when she left Port Eads, that is controlling.

If going into Key West or Havana for repairs constituted voluntary deviation, then returning to New Orleans from Port Eads for repairs would have constituted voluntary deviation, and when the ship broke ground at Port Eads she would have had no option but to deviate. To oblige a master of a ship to choose between such alternatives has been condemned. Kish v. Taylor, [1912] A. C. 604, 614.

[3] Even when the ship broke ground at Port Eads, the master was not certain that he would

be compelled to seek a port of refuge. To seek a port of refuge, if in the judgment of the master the safety or best interest of crew, ship, or cargo requires it, when a ship is unseaworthy from unfitness of structure, is not a deviation. The Turret Crown (C. C. A.) 297 F. 766.

In the last-cited case we followed the House of Lords in Kish v. Taylor, supra, which was a case of unseaworthiness from overloading, and in which case it was held that it is the presence of the peril, and not its cause, which determines the character of the deviation. The Circuit Court of Appeals in the Fourth Circuit also followed Kish v. Taylor, supra, in The Turret Crown, 284 F. 439.

This holding is not inconsistent with the decision of the Supreme Court in The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. ——, 1927 A. M. C. 129, and the House of Lords in United States Shipping Board v. Bunge, [1925] 31 Com. Cas. 118, in which cases the deviations were caused by the ships leaving port with insufficient fuel.

[4, 5] The distinction is plain. If the circumstances under which the ship leaves port are such that it must be known that she will be compelled to deviate, e. g., a shortage of fuel, the deviation is voluntary. If, however, the ship leaves port unseaworthy, which includes one badly stowed, even if it was known, she does not voluntarily deviate if she seeks a port of refuge. We therefore hold that the schooner did not voluntarily deviate when she sought a port of refuge at Key West or Havana.

The circumstances under which the Baxter put into Key West and Havana were not caused by gross negligence, as that term is used in the opinion in The Willdomino, supra, because it was not plain when she left New Orleans that deviation was inevitable.

[6] The delay of the Baxter at Havana was a result of her unseaworthiness, but a breach of the covenant of seaworthiness on sailing did not require the owner to discontinue further performance of the contract of affreightment. All necessary repairs were made at Havana as fast as circumstances would allow, and the ship was seaworthy and ready to proceed on her voyage on January 14, 1920. The embargo was not the result of the unseaworthiness of the ship, and for it she was not responsible.

[7] The embargo was an unusual exercise of power by the government, a permanent restraint, making the sailing of the ship illegal, and therefore impossible, and rendering that illegal which had previously been legal. Allanwilde Corp. v. Vacuum Oil Co., 248 U. S. 377, 39 S. Ct. 147, 62 L. Ed. 312, 3 A. L. R. 15; Int. Paper Co. v. The Gracie D. Chambers, 248 U. S. 387, 39 S. Ct. 149, 63 L. Ed. 318; Standard Varnish Works v. The Bris, 248 U. S. 392, 39 S. Ct. 150, 63 L. Ed. 321.

The contract to carry the cargo to Bordeaux, which, after making the repairs, the ship was ready to perform, was thus by the embargo rendered illegal and impossible of further performance, entirely independent of any exception or express agreement in the parties. Therefore the provisions of the bill of lading are effective.

[8] No damages can be allowed against the ship or petitioner because of the embargo, nor can there be any recovery of prepaid freight; but the ship and petitioner are, under the terms of the bill of lading, liable only for the actual damage to the malt and starch, and for the difference between the value of the goods, had they arrived at Bordeaux on a straight voyage leaving New Orleans on August 16, 1917, and on a voyage leaving Havana on January 14, 1918.

The decree is reversed, with costs, and with direction to the District Court to enter an interlocutory decree in accordance with this opinion.

On motion for rehearing and reargument.

PER CURIAM. In our opinion we held the Baxter and the petitioner were liable for the consequences of the breach of warranty of seaworthiness, and when we mentioned starch and malt we did not mean to exclude damages to tobacco, general average payments, nor any other damages due to the Baxter's unseaworthiness. The costs awarded were only the costs in this court.

While the award of costs in the court below was reversed as a part of the decree, we made no award of the costs in that court. When a final decree is entered by the District Court, the costs will be awarded by that court as it may determine upon the facts.

We considered and determined the questions sought to be reargued, as to the retention of prepaid freight, frustration, deviation, and measure of damages, and see no reason for granting a rehearing and reargument.

Motion denied.