## THE AGWIMOON.

District Court, D. Maryland. March 16, 1928.

No. 1531.

1. **Shipping 42(1)—Statute, being incorporated in charter, reduces absolute warranty of seaworthiness to obligation to use due diligence (Harter Act, § 2 [46 USCA § 191]).**

Though the Harter Act, § 2 (46 USCA § 191; Comp. St. § 8030), does not apply of its own force to a private contract of shipping, yet, it being expressly incorporated in the charter and thereby becoming applicable in all its terms, it reduces the otherwise absolute warranty of seaworthiness to an obligation to use due diligence only.

2. **Shipping 137—More than casual inspection is necessary for "due diligence" required by statute (Harter Act [46 USCA §§ 190–195]).**

The kind of "due diligence" as to seaworthiness required by the Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035) comprehends something more than a mere casual inspection.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Due Diligence.]

3. **Shipping 137—Obligation to use due diligence to make steel tanker seaworthy at beginning of voyage with oil cargo held not met (Harter Act [46 USCA §§ 190–195]).**

The obligation to use due diligence to make vessel seaworthy at beginning of voyage *held* not met; she being a steel tanker, the cargo being oil, serious leaks having developed in an average voyage for the time of year in those waters, so that they cannot be ascribed to perils of the sea, the owners testifying that they found it good practice to dry-dock and examine her every six months, more than that time having elapsed since the last dry-docking, and, though she had just completed a rough voyage, she being started on another after a very superficial inspection, and the condition of her wasted rivets at end of voyage indicating that they were in virtually as bad condition when she started on her voyage, so that the leaks were not ascribable to latent defects not discoverable by the use of due diligence, against which the

Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035) is designed to protect the vessel owner.

**4. Shipping ☞42(1)—Provision in charter that vessel shall not be liable for leakage held subject to condition of due diligence to make seaworthy at inception of voyage (Harter Act [46 USCA §§ 190–195]).**

Provision in private contract of carriage that vessel shall not be liable for leakage is subject to condition that due diligence to make vessel seaworthy at inception of voyage shall have been exercised; the Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035) being expressly incorporated, not only in bill of lading, but in the charter party itself.

**5. Shipping ☞131—Damages for loss of part of vessel's cargo held market value at time and place of delivery.**

The proper basis for damages for vessel's loss of part of cargo is its market value at time and place of delivery.

In Admiralty. Libel by the Interocean Oil Company against the steamship Agwimoon. Decree for libelant.

Robert Williams, Robert France, and Brodnax Cameron, all of Baltimore, Md., for libelant.

George W. P. Whip, of Baltimore, Md., for claimant.

WILLIAM C. COLEMAN, District Judge. This is a libel brought by the purchaser of a cargo of stove oil against the tanker Agwimoon, to recover for the loss of 70,205 gallons, due to leakage from the vessel during the course of a voyage from Martinez, Cal., through the Panama Canal, to Baltimore, which respondent claims was the result of the vessel's unseaworthiness. The oil was shipped on February 13, 1927, under a private contract of carriage, which had the usual provision that the vessel was "tight, staunch, and strong and in every way fitted for the voyage, and to be maintained in such condition during the voyage, perils of the sea excepted. * * *" There were also the following provisions:

"The act of God, perils of the sea, fire, barratry of the masters and crew, enemies, pirates, assailing thieves, arrests, and restraints of princes, rulers, and people, collisions, stranding, and other accidents of navigation excepted, even when occasioned by negligence, default, or error in judgment of the pilot, master, mariners, or other servants of the shipowners. Ship not answerable for losses through explosions, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, not resulting from want of due diligence by the owners of

24 F.(2d)—55

the ship, or any of them, or by the ship's husband or master. The steamer has liberty to call at any ports in any order, to sail without pilots, and to tow and assist vessels in distress, and to deviate for the purpose of saving life or property. * * *"

" * * * The steamer is not to be accountable for leakage."

" * * * It is mutually agreed that the shipment is subject to all the terms and provisions of, and all the exemptions from liability contained in the Act of Congress of the United States of America approved on the 13th day of February, 1893, and entitled 'An act relating to navigation of vessels, etc.'" Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035).

The Agwimoon is the ordinary type of steel tanker, built in 1920, and has since been in continuous service. The evidence shows that in 1924 she was thoroughly examined in dry dock, as required by the classification societies, and rated A–1. In July, 1926, she was again dry-docked, her tanks partially filled with water, and all rivets showing signs of leaks were repaired. She was not at this time, however, completely overhauled, since such is not required by the classification rules except once every four years. Pressure test was not applied or new rivets put in, but the repairing was done by outside welding. The next complete overhauling was not due till 1928. Shortly before the voyage in question, the Agwimoon had carried a cargo of oil to Japan, and returned in ballast to San Francisco. On this trip considerable heavy weather was encountered. No leaks were noticed, however, and at San Francisco the only inspection made before loading the present cargo was the usual one made by representatives of a recognized petroleum inspecting concern. This consisted of looking into the top of the tanks through an eight-inch ullage opening with a pocket flash light. It was admitted that such inspection was not primarily directed to the finding of leaks, but that, had any been discovered, they would have been reported. After this inspection, the vessel was pronounced fit to receive the cargo.

As the vessel was leaving Martinez after loading, the dockmaster and one of his men testified that they saw oil bubbling up from the vicinity of No. 9 tank, and by the side of the vessel in such a manner that it could only come from a leak, and stated that the master's attention was called to this fact. Other persons on the dock at the same time who saw the vessel depart, and the ship's

officers, stated they did not see such a condition. Furthermore, none of the officers of the vessel admit hearing the dockmaster's warning of the leak, although he claims that the captain acknowledged the warning. Heavy weather was experienced for about three days after leaving Martinez, and thereafter some leakage was discovered in the vicinity of No. 1 tank. It was not sufficient, however, to cause the canal authorities to refuse passage to the vessel. More heavy weather was encountered after leaving the canal, but, on the whole, conditions were normal.

Upon arrival in Baltimore, the cargo was about 2 per cent. short of the original amount, exclusive of the customary allowance of one-half of 1 per cent. for evaporation. After discharging, the vessel was put in dry dock, where some 52 wasted, leaky rivets were found. It is admitted that she was at this time leaking badly in five tanks—to a greater extent than had ever occurred in some two hundred similar cargoes.

[1] Since this is a private contract of carriage, the Harter Act, § 2 (46 USCA § 191; Comp. St. § 8030), does not apply of its own force. But it has been expressly incorporated in the charter and thereby becomes applicable in all its terms. The Fort Gaines, 24 F.(2d) 849. It therefore reduces the otherwise absolute warranty of seaworthiness to an obligation to use due diligence only. So the questions to be determined are (1) whether this obligation has been met, and (2) the effect of the leakage clause.

[2, 3] As to the question of the exercise of due diligence, the court is of the opinion that the vessel's obligation has not been met. The kind of due diligence which is required by the Harter Act comprehends something more than a mere casual inspection. The Munamar (D. C.) 23 F.(2d) 194; Compagnie v. Meyer (C. C. A.) 248 F. 881; The Fort Gaines, supra. The court has not lost sight of the decision in The Sandfield (D. C.) 79 F. 371, where it was held that due diligence in looking for leaky rivets does not require dry-docking more than once a year, in the absence of a known necessity. But here we are dealing with an oil tanker whose hull obviously must be much more secure than that of a general dry cargo vessel, such as The Sandfield. That is to say, a leak, more or less, in the course of carriage of an ordinary dry cargo, may make no difference in seaworthiness, but any leak in a tanker does amount to unseaworthiness. The skin of such a vessel is the lining of the tank; the vessel is a huge floating tank. Obviously, the tank must be impermeably sealed. "As seaworthiness depends not only upon the vessel being staunch and fit to meet the perils of the sea, but upon its character in reference to the particular cargo to be transported, it follows that a vessel must be able to transport the cargo which it is held out as fit to carry or it is not seaworthy in that respect." (Italics inserted.) The Southwark, 191 U. S. 1, 9, 24 S. Ct. 1, 3, 48 L. Ed. 65.

Another important fact which leads the court to conclude that the owners of the vessel did not exercise due diligence is that serious leaks developed in the course of what was admittedly an average voyage for that time of the year in those waters. So the leaks cannot be ascribed to perils of the sea. The weather did not at any time become "something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." Hough, J., in The Rosalia (C. C. A.) 264 F. 285, 288. See, also, Pacific Coast S. S. Co. v. Bancroft-Whitney Co. (C. C. A.) 94 F. 180, 196.

The court does not feel that it is fair to say, on the evidence, that there were latent defects in the skin of the vessel not discoverable by the use of due diligence, against which the Harter Act is designed to protect the vessel owner. The Irrawaddy, 171 U. S. 187, 192, 18 S. Ct. 831, 43 L. Ed. 130. For the owners have testified that they found it "good practice" to dry-dock and examine the ship every six months, which reasonably carries the implication that some repairs were usually discoverable at the end of every such period. Six months had elapsed since the last dry-docking, July, 1926. The vessel had just completed a rough voyage. Therefore, the court feels that it was negligent to dispatch her on another trip after only a very superficial inspection. The condition of the wasted rivets indicated that they were in virtually as bad condition when the vessel left the west coast.

The court reaches this conclusion independently of the testimony of the wharfingers, already referred to, that they saw oil leaking from the side of the vessel, as she left Martinez. Further, the inspector whose attention was directed to the vessel by one of the wharfingers testified that he could see no leak. It is significant that, while the wharfinger said the leak was in the vicinity of No. 9 tank astern, no leaks were found there when the vessel was dry-docked at Balti-

more. The only leaks were forward; and, at the very slow speed the vessel was moving when the wharfinger made his alleged discovery, any oil issuing from an open seam should have evidenced itself at or near such seam as well, the oil being extremely light.

[4] The final question is whether the leakage clause operates to relieve the vessel from liability. Were this a case of a common carrier, there would be no doubt that the failure to exercise due diligence prevents reliance upon the clause. The Breedijk (D. C.) 22 F.(2d) 328; The Thomas P. Beal (C. C. A.) 11 F. (2d) 49. The court is not impressed with the argument of respondent that, if the provisions in the Harter Act are to be held applicable by agreement of the parties and not by force of law, then the situation is the same as if the Harter Act itself had not been mentioned and the parties had expressly agreed in the first provision of the contract, hereinabove quoted, that the shipowner should exercise due diligence to make the vessel seaworthy; in other words, that the shipowner's obligation has, in effect, not been expanded, but, on the contrary, has been limited from an absolute covenant to a mere obligation to be diligent, and that therefore, since the greater includes the less, and since the primary, unlimited obligation to have the ship seaworthy was held to be modified by the leakage clause in the G. R. Crowe (C. C. A.) 294 F. 506, where there was a much greater percentage of loss, 11 per cent., than in the present case the shipowner here must be excused from liability.

This argument seems to the court to be unsound. The parties have agreed to make the act applicable to their contract, and have expressly incorporated it, not merely in the bill of lading, as was the case in The G. R. Crowe, supra, upon which respondent relies, but in the charter party itself. If the act is not effectuated in the same manner that it would be for a common carrier—that is, in all its terms—then the agreement amounts to nothing. In The Cornelia (D. C.) 15 F.(2d) 245, the court so decided. It was there held that the vessel, having failed to prove use of due diligence, could not rely on an exemption clause, in view of a provision incorporating the Harter Act in the charter. The court said (page 247):

"But here the parties agreed that their contract should be governed by all the provisions and exemptions of that act. Necessarily exemptions contained in the contract and in the bills of lading, the provisions of which were embodied in the contract, are, as the parties agreed they should be, subject to the provisions of the Harter Act, not because the agreement of carriage is a shipping document within the meaning of that statute, but because the parties themselves agreed that the statute should apply to their contract of carriage."

We have the further consideration that exceptions in favor of a shipowner incorporated in the charter party prepared by the shipowner are to be construed most strongly against him. The obligation to furnish a seaworthy vessel should not be held to have been contracted away by implication. The Caledonia, 157 U. S. 124, 137, 15 S. Ct. 537, 39 L. Ed. 644. Thus, taking the charter as a whole, the proper meaning to be derived from it is that the shipowner shall be responsible for leakage, unless he has exercised due diligence to make the vessel seaworthy at the inception of the voyage.

[5] A decree will be signed in favor of libelant for a sum computed on the proper basis for damages in such a case, the market value of the oil at time and place of delivery in Baltimore. The Arctic Bird (D. C.) 109 F. 167.