VENEZUELAN MEAT EXPORT CO., Limited, v. UNITED STATES.

No. 1945.

District Court, D. Maryland.

Oct. 9, 1935.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, and Ritchie, Janney, Ober & Williams, of Baltimore, Md., for libelant.

Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., and F. R. Conway, Office of Solicitor, Department of Commerce, of Washington, D. C.

WILLIAM C. COLEMAN, District Judge.

This suit is brought under the Suits in Admiralty Act of March 9, 1920, as amended by the Act of June 30, 1932 (46 U. S. C. § 745 [46 USCA § 745]), against the United States, to recover for damage to a cargo of hides, the property of libelant, shipped from Puerto Cabello, Venezuela, in March 1919, to Havre, France, on the steamship Balosaro. The parties have entered into a

stipulation with respect to all of the material facts, which will be presently recited.

In September 1919, shortly after the delivery of the hides, libelant instituted proceedings to recover damages in the Tribunal of Commerce at Havre, against the master as representing the vessel. He intervened on behalf of the ship and defended the suit, and the French court rendered a judgment against him which has never been satisfied, amounting to 1,769,543 francs. In March, 1921, libelant instituted a suit in admiralty in the United States District Court for the Southern District of New York, but, before any trial on the merits, this suit was discontinued in April, 1924, and thereafter, in August, 1924, libelant commenced a suit against the United States under the Tucker Act (24 Stat. 505) in the Court of Claims, in which the French judgment was pleaded. In December, 1930, the Court of Claims dismissed this suit on the ground that there was no contract, express or implied, with the government of the United States, and that therefore the Court of Claims had no jurisdiction. See 58 Ct. Cl. 76. Then, on January 6, 1930, in the case of Johnson v. U. S. Shipping Board Emergency Fleet Corporation, 280 U. S. 320, 50 S. Ct. 118, 74 L. Ed. 451, the Supreme Court decided that the remedy provided by the Suits in Admiralty Act (see 46 USCA § 741 et seq.) was exclusive and this decision occasioned the amendatory legislation under which the present suit is brought. Briefly stated, the object of this legislation, to wit, the amendment of June 30, 1932 (46 U. S. C. § 745 [46 USCA § 745]), to the Suits in Admiralty Act, was to correct an apparent injustice which would result from this decision were the statutory period provided in the original Act not extended; that is to say, 10 years after the Suits in Admiralty Act had been passed, the Supreme Court held for the first time that suits in admiralty were the sole and exclusive remedy against the United States and the Fleet Corporation for the adjudication of claims arising out of the operation of United States merchant ships. As a result, many actions brought by claimants who had relied on the earlier uniform decisions of the various courts, and who had not brought their actions either in the manner or within the time provided in the Suits in Admiralty Act, were dismissed for lack of jurisdiction. This prevented such claimants from having any adjudication of their claims on their merits.

The text of the amendment is as follows (46 U. S. C. § 745 [46 USCA § 745]): "Suits as authorized in this chapter shall be brought within two years after the cause of action arises: Provided further, That the limitations in this section contained for the commencement of suits hereunder shall not bar any suit against the United States or the United States Shipping Board Merchant Fleet Corporation, formerly known as the United States Shipping Board Emergency Fleet Corporation, brought hereunder on or before December 31, 1932, if such suit is based upon a cause of action whereon a prior suit in admiralty or an action at law or an action under subdivision (1) of section 250 of Title 28, was commenced prior to January 6, 1930, and was or may hereafter be dismissed because not commenced within the time or in the manner prescribed in this section, or otherwise not commenced or prosecuted in accordance with its provisions: Provided further, That such prior suit must have been commenced within the statutory period of limitation for common-law actions against the United States cognizable in the Court of Claims: Provided further, That there shall not be revived hereby any suit at law, in admiralty, or under subdivision (1) of section 250 of Title 28 heretofore or hereafter dismissed for lack of prosecution after filing of suit."

Thus it will be seen that the amendment of June 30, 1932, provides in substance that those claimants who actually brought suit before January 6, 1930, that is, the date of the decision of the Supreme Court in the Johnson Case, and within the statutory period of limitation for common-law actions, but not in the manner and within the time provided by the Suits in Admiralty Act, should have their day in court on the merits as prescribed by the Suits in Admiralty Act. No suits which were dismissed for lack of prosecution may be revived by the amendment, nor is any interest allowed on claims prior to the time of the institution of the new actions.

The first point which is raised by the government and which must be disposed of relates to the jurisdiction of this court, and is to the effect that, under section 5 of the Suits in Admiralty Act (46 USCA § 745) just quoted, the libelant has no greater rights in the present suit than what he would have had if he had not been left without remedy by the unforeseen and belated construction placed by the Supreme

Court on the Suits in Admiralty Act; that is to say, the government maintains that this court has jurisdiction to render only such decree as the Court of Claims could have rendered had its jurisdiction not been ousted by the decision in the Johnson Case; and that, since the Court of Claims had jurisdiction only in contract and not in tort, libelant in the present suit may recover, if at all, only upon a contractual liability. On the other hand, libelant asserts that the use of the phrase "cause of action" in the legislative amendment is to be taken in its broad sense; namely, the subject-matter of the controversy. See Chesapeake & Ohio Railway v. Dixon, 179 U. S. 131, 21 S. Ct. 67, 45 L. Ed. 121; United States v. California & Oregon Land Co., 192 U. S. 355, 24 S. Ct. 266, 48 L. Ed. 476; United States v. Memphis Cotton Oil Co., 288 U. S. 62, 53 S. Ct. 278, 77 L. Ed. 619.

We feel that the broader construction asserted by libelant is the proper one. The original concept of the Suits in Admiralty Act was to substitute an equivalent remedy in personam against the United States for a right in rem against the vessel, and the United States assumed thereby the same liability with respect to the operation of vessels in the merchant service that any private shipowner or operator assumed. See Blamberg Bros. v. United States, 260 U. S. 452, 43 S. Ct. 179, 67 L. Ed. 346; Nahmeh v. United States, 267 U. S. 122, 45 S. Ct. 277, 69 L. Ed. 536; Eastern Transportation Co. v. United States, 272 U. S. 675, 47 S. Ct. 289, 71 L. Ed. 472. But we are told by the government that there is nothing in the language of the amendment which should persuade us that Congress intended to do more than to place suitors in as good a position as they would have been in had the Supreme Court not rendered its decision in the Johnson Case too late for new actions to be brought in compliance therewith—namely, which would not be barred by the two-year limitation provided in the act. Further, we are told that there was no hardship or surprise involved with respect to actions sounding in tort, because it was well established, long before libelant filed suit in the Court of Claims, that suitors were confined to contractual claims there. See Goodyear Tire & Rubber Co. v. United States, 276 U. S. 287, 48 S. Ct. 306, 72 L. Ed. 575; Alabama v. United States, 282 U. S. 502, 51 S. Ct. 225, 75 L. Ed. 492; see, also, Baltimore Mail S. S. Co. v. United States (C. C. A.) 76 F.(2d) 582, and cases cited.

We find no reported decision of the precise question before us. The nearest approach is to be found in such cases as Adders v. United States (C. C. A.) 70 F.(2d) 371, or Phoenix Ins. Co. v. United States (D. C.) 3 F. Supp. 112, upon which libelant relies. But in the Adders Case the question was whether the amendment of 1932 covered a situation in which an action, which had been brought against the United States Shipping Board Emergency Fleet Corporation, was dismissed, and a later libel was filed against the United States. In holding that the amendment applied to such a case, the court merely decided that it would be unreasonable to insist upon the formal identity of the obligor when both respondents are in substance the same. In the Phoenix Ins. Co. Case the court merely held, finding no intent on the part of Congress to limit relief under the act to then owners of existing causes of action, it should not be so limited, but should include a subrogee of such owners. See The City of Brunswick (D. C.) 6 F. Supp. 597, and Galveston Dry Dock & Construction Co. v. United States (D. C.) 7 F. Supp. 460.

■ Where there is any ambiguity with respect to the meaning of an act of Congress, it is competent for a court to use, as an aid to interpretation, reports of congressional committees. See Railroad Commission of Wisconsin v. C., B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Duplex Printing Press Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196. Such reports of both the Senate and the House of Representatives, while perhaps not expressly supporting the construction here placed upon the amendment, at least permit and strongly suggest it. In the report to the Senate from the Committee on the Judiciary when the bill was under consideration, it is stated that "the purpose of this bill is to correct an injustice which resulted from an unforeseen and belated construction of the Suits in Admiralty Act." Report No. 771, 72 Cong., 1st Sess., accompanying H. R. No. 7238, June 1, 1932. (Italics inserted.) It is argued for the government that the "injustice" is obviously corrected by the interpretation which we are asked by the government to give to the amendment, and that we should not, in the face of this language, infer that the legislators intended to do more than "correct an injustice." Similarly, in the report from the Committee on the Judiciary of the House, it is

stated "the object of this bill is to correct a condition which could not have been foreseen and which was created by the unexpected interpretation of the admiralty act * * * by the United States Supreme Court. * * * As a result * * * a number of litigants who had relied on the decisions of the various courts and who did not bring their suits either in the manner or within the time prescribed by the admiralty act, found that it was too late for them to apply for *the reinstatement of their cases.*" Report No. 1012, 72 Cong., 1st Sess., accompanying H. R. No. 7238, April 7, 1932. (Italics inserted.) From this, the government likewise contends that, in the absence of some supplementary, broader language, the use of the words "reinstatement of their cases" should not be taken as meaning the right to pursue a remedy in the admiralty courts which could not have been pursued in the Court of Claims at any time under the Tucker Act (24 Stat. 505). But we think "the cause of action" referred to in the statute now before us is the wrong alleged to have been done, not the measure of compensation for it, because admiralty does not make distinctions of pleading between tort and contract [see Dampskibs Aktieselskabet Thor v. Tropical Fruit Co. (C. C. A.) 281 F. 740; The Gerald A. Fagan (C. C. A.) 49 F.(2d) 215, affirmed Marine Transit Co. v. Dreyfus, 284 U. S. 263, 52 S. Ct. 166, 76 L. Ed. 282], and we are unwilling to import such a distinction into this statute where clear evidence of an intention so to do on the part of its framers is nonexistent. In Friederichsen v. Renard, 247 U. S. 207, page 210, 38 S. Ct. 450, 451, 62 L. Ed. 1075, where change from an equity suit, brought to amend a contract and for damages, to an action at law for deceit, was held not to be a new suit, the court said: "The cause of action is the wrong done, not the measure of compensation for it, or the character of the relief sought, and, considered as a matter of substance, the change in the statement of that wrong in the amended petition cannot in any just sense be considered a new or different cause of action." See, also, United States v. Memphis Cotton Oil Co., 288 U. S. 62, 67, 68, 53 S. Ct. 278, 280, 77 L. Ed. 619, where the court defined the true rule to be applied in interpreting the meaning of the phrase "cause of action," as follows: "A 'cause of action' may mean one thing for one purpose and something different for another. It may mean one thing when the question is whether it is good upon demurrer, and something different when there is a question of the amendment of a pleading or of the application of the principle of res judicata. Cf. Chicago, R. I. & P. Ry. Co. v. Schendel, 270 U. S. 611, 617, 46 S. Ct. 420, 70 L. Ed. 757, 53 A. L. R. 1265; Baltimore S. S. Co. v. Phillips, 274 U. S. 316, 321, 47 S. Ct. 600, 71 L. Ed. 1069. At times and in certain contexts, it is identified with the infringement of a right or the violation of a duty. At other times and in other contexts, it is a concept of the law of remedies, the identity of the cause being then dependent on that of the form of action or the writ. Another aspect reveals it as something separate from writs and remedies, the group of operative facts out of which a grievance has developed. This court has not committed itself to the view that the phrase is susceptible of any single definition that will be independent of the context or of the relation to be governed."

Thus, without limiting the right of libelant to recover, if at all, in the present suit on the basis of contract, we pass to a consideration of the merits of the case, which necessitates a consideration of the material facts. These are as follows, as disclosed by stipulation of the parties:

The libelant, owner and shipper of the cargo, is a British corporation. In January, 1919, the Balosaro, a composite steel and wood vessel, 267 feet long, 46 foot beam, 22 feet draught, 2,469 gross, and 1,472 net, tons, was chartered to F. D. Dimmick & Co., of Philadelphia, by the United States Shipping Board Emergency Fleet Corporation as the latter's operating agent. The construction of the Balosaro was not actually completed until some time in February, 1919, whereupon she was inspected by officials of the Shipping Board and by their marine engineers, and, after a trial trip, she was turned over to Page & Jones, of Mobile, Ala., who operated her subject to the charter party on behalf of the Shipping Board. Her officers and crew were paid by the Shipping Board, by whom her master was also appointed and paid, and he received his sailing instructions from Page & Jones. He had had little previous experience in merchant or cargo vessels, although he had had long experience in the Navy, in command of ocean-going and coastwise tugs.

The Balosaro sailed from Mobile on February 23, 1919, for Puerto Cabello, Venezuela, but, due to a series of mishaps, did

not arrive there until 17 days later, that is, on March 12th, when normally she should have made the trip in 8 days, under the conditions of wind and sea which she encountered, which were not especially adverse. The delay was due to almost constant stopping for repairs, including leaking boiler tubes and faulty pumps, as well as a series of other breakdowns relating to boilers and other parts of the vessel which need not be detailed here. At Puerto Cabello, a survey was had by three presumably competent persons appointed by the American consul. Various repairs were recommended which were prosecuted under the supervision of the Balosaro's chief engineer, while the vessel's cargo was being loaded. This cargo consisted of 38,-708 green, salted hides, evidenced by three bills of lading, certain provisions of which will be hereinafter specifically referred to. These bills were signed by Capt. Johnson as master of the Balosaro. The hides were properly cured, in good order and condition, and fit for the contemplated voyage when placed on board the Balosaro. They were stowed under the supervision of the vessel's chief officer in lower holds No. 1 and No. 2, and, since there is no allegation that this particular stowage was improper, its details do not here concern us.

On March 24, 1920, the Balosaro left Puerto Cabello for Pointe a Pitre, Guadeloupe, to take on additional cargo, the loading of her cargo having been completed on the 21st, but repairs to her machinery were not completed until 3 days later. Machinery trouble still persisted, which materially lessened the speed of the vessel, and she did not reach Pointe a Pitre until March 27th, where she took on approximately 4,-725 casks of rum, the larger part of which were stowed over the hides in the square of the hatches where there were no 'tween decks. Only 2x12 planks, which were not water-tight, separated the casks from the hides. They were stowed fore and aft, bung up and bilge free, butt to butt, no dunnage being placed between the butts, but merely between the sides of the casks. The chief officer of the Balosaro had charge of the loading and stowage of the rum, and he noted that some 49 of the casks were leaking at the time.

Due largely to repairs, the Balosaro did not leave Pointe a Pitre for Havre until April 20th. Thereafter, almost daily, there ensued further difficulties with the machinery, boilers, pumps, etc., and on April 23d,

as a result of the chief engineer informing the master that he did not think the vessel could make Havre, her course was changed for St. Thomas, Virgin Islands; Page & Jones, agents, were notified to that effect by cable, and they were requested to send a marine superintendent, new engineers, and new captain. The master sent this message because he did not consider the vessel seaworthy with the pumps in such condition, and wanted to be relieved of his command. He requested new engineers because he did not consider the ones she had very competent.

En route to St. Thomas the vessel was stopped repeatedly for repairs, and she did not arrive there until April 27th and then under tow. Four new engineers (chief, first, second, and third assistant) were placed on the vessel, and the original engineers sent back to the United States; but Capt. Johnson, at the request of the marine superintendent sent out by Page & Jones, remained in command. Various parts of the defective machinery were found to be beyond repair, and the vessel remained at St. Thomas until July 6, 1919, awaiting the new equipment, during which time the temperature was continuously in the neighborhood of 100 degrees Fahrenheit, and the hatches were left open in the daytime. On the latter day the Balosaro left for Havre. A few days after leaving St. Thomas, it became evident to the master, from the odor emanating from the hatches, that the hides had begun to decay. Further misfortune pursued the vessel. Repeated repairs became necessary upon the machinery, necessitating frequent stopping of the vessel. She changed her course for Fayal, Azores, on July 14th, arriving there on July 22d, where she remained for 2 days pending repairs, and on July 24th proceeded for Havre, where she arrived on August 2d, lying in the roads at Havre from August 2d to August 26th, because, due to congestion in navigation, she could not sooner get a berth for discharging her cargo. According to the master, the Balosaro should have made the entire trip from Puerto Cabello to Havre, including the loading at Guadeloupe, in 40 days, instead of which it actually took her 131 days; and the vessel, if in good condition, should have averaged 240 miles a day under existing conditions, but at no time during the whole voyage did she approximate that rate of speed, although, with little exception, the weather throughout the voyage was

comparatively mild; and at no time were conditions other than those that should have been reasonably anticipated and overcome.

The Balosaro had discharged her entire cargo, including the hides, by September 9th. 145 casks of rum were discharged leaky, and 56 empty. Some of the hides were found to be seriously damaged. Thereupon, forwarding agents, on behalf of the present libelant, commenced an action against the master in the Tribunal of Commerce at Havre, which has been hereinbefore referred to. That tribunal caused a survey to be made of the hides and an arbitration was had to determine the cause and amount of the damage. This survey disclosed that the injury and damage to the hides was caused by the rum, which had leaked from the casks improperly stowed over some of the hides. The result of this litigation was the judgment hereinbefore referred to against the master for 1,769,543 francs, which was entered on March 10, 1920. Shortly after the commencement of these proceedings and seizure of the vessel by those claiming damage to the rum, she had been released by the French court upon representations of the United States consul at Havre that she was the property of the United States government.

The two pertinent paragraphs of the bill of lading are the following, paragraphs 5 and 12:

"5. Also, it is mutually agreed that, unless a higher value be stated herein and an increased freight rate specially arranged therefor, the value of the merchandise hereby receipted for does not exceed $250.-00 per freight ton, and relatively for any portion thereof, or exceed $100.00 per package, and that the freight has been adjusted on such valuation, and no oral declaration or agreement shall be evidence of a different provision, or of a waiver of this clause. In the event of any liability being adjusted against the Vessel, or Owners, in respect to the merchandise, no value shall be placed on such merchandise higher than the Invoice cost, not exceeding $250.00 per freight ton, and relatively for any portion thereof, or exceed $100.00 per package, or such other value as may be expressly stated herein and agreed to; and also that the Carrier shall not be liable for articles comprised in section 4281 of the Revised Statutes of the United States."

"12. Also, that in all cases of damage or loss of such goods or merchandise, the amount of claim or damage shall be restricted to the cash value of such goods or merchandise, at the port of departure at the time of shipment; and that all claims for partial loss or damage shall be ascertained and adjusted upon the same basis of value, plus duty and custom charges actually incurred."

It is stipulated that, because of the damaged condition of the hides, libelant was damaged in the sum of $210,570.24 and also incurred expense in the sum of 61,104 francs. It is also stipulated that, on the basis of quantum of damage found by the experts appointed by the French court and the value of the hides at $250 per ton, the limit of respondent's liability, if there be any liability, is $51,723.32, provided the limitation contained in paragraph 5 of the bill of lading above quoted controls. It is further stipulated that, on the other hand, if the provisions of paragraph 12 of the bill of lading above quoted control, then, based on the percentage of damage found by the experts appointed by the French court, the limit of respondent's liability, if there be any liability, is $144,745.31.

Having decided that such liability, if any, as rests upon the respondent, resulting from the damage to the cargo of hides, is not restricted to that which arises out of a contractual relationship, but may be based upon any applicable rule of liability in admiralty, we turn to two grounds which have been raised by the government by way of defense to *any* recovery on the part of libelant: First, that libelant's election to sue the master in the French court amounts to abandonment or waiver of any right to recover in the present suit; second, that the government is not liable, because such liability as may exist is determined by the bills of lading, and the government was not a party to them.

Taking up these two questions in the order above stated, we find that libelant's election to sue in the French court cannot be construed as abandonment or waiver of any rights in the present proceeding, because, first, the French judgment is not one which our courts recognize as res adjudicata [see Hilton v. Guyot, 159 U. S. 113, 16 S. Ct. 139, 40 L. Ed. 95]; and, second, the defense of election must be, but has not been, pleaded either in the Court of Claims or here, having been raised for the first time in the course of the present trial [see World's Fair Mining Co. v. Pow-

ers, 224 U. S. 173, 32 S. Ct. 453, 56 L. Ed. 717; Henderson Tire & Rubber Co. v. Gregory (C. C. A.) 16 F.(2d) 589, 49 A. L. R. 1503; Scott v. W. R. Grace & Co. (C. C. A.) 275 F. 340].

Secondly, with respect to the contention that the United States government cannot be liable because not a party to the bills of lading, we find no merit in this contention. The government stresses the following provisions in the charter party (paragraph 9): " * * * The Captain (although appointed by the Owners) shall be under the orders and direction of the Charterers as regards employment, agency, or other arrangements; and the Charterers. hereby agree to indemnify the Owners from all consequences or liabilities that may arise from the Captain's signing Bills of Lading or otherwise complying with the same. Captain in signing Bills of Lading shall act as the agent of the Charterers." But the charter party was a time charter and not a demise. Therefore control did not pass to the charterer. United States v. Shea, 152 U. S. 178, 14 S. Ct. 519, 38 L. Ed. 403; Luckenbach v. Insular Line (C. C. A.) 186 F. 327. The bills of lading, signed by the master and containing no reference to the charter party, nor to the owner, nevertheless bind the government, as owner, because, as between the shipper and the owner, the master was acting for the owner. The Themis (C. C. A.) 275 F. 254, certiorari denied, Barber & Co. v. Wilhelmsen, 257 U. S. 655, 42 S. Ct. 97, 66 L. Ed. 419. As was said in that case (275 F. 254, page 262): "It is sufficiently shown in Judge Hand's opinion that by acceptance of cargo, the ship became liable in rem for due performance of the contract of affreightment. But when (Barber & Co.'s authority to sign for the master being undisputed) the master of a ship chartered but not demised, which was the condition of Themis, issues bills of lading, we hold that the contract evidenced thereby is not only the ship's contract, and that of the time or other charterer who caused their issue, but that of·the owner, whose master (i. e., authorized agent) issued the same. Therefore in this instance the shippers had, beyond the obligation of the ship, the right to look to all three respondents, and hold any or all of them personally liable for right fulfillment of the bills."

Similarly, in The Capitaine Faure (C. C. A.) 10 F.(2d) 950, pages 962, 963, it was said:

"It is certain that the charter party was not a demise. The captain, officers, and crew were not appointed by the charterers, but named by the owners, and through them the owners were in possession of the vessel and responsible for her navigation. Moreover, the fact is that the ship did not appear in the advertisements as a chartered vessel, and it is not shown that the shippers who dealt directly with the Fulton Steamship Corporation had any notice that the ship was a chartered vessel. * * *

"Under the charter in this case the owners appointed the master and officers and hired the crew, and the charterers had no power to displace them, and it is not suggested that the ship was in the possession of the charterers. She was, during the whole period involved, in the possession of her owners, and consequently the master bound the ship, and not the charterers merely in all the bills of lading which he lawfully signed.

"As between the shipowner and the charterer, the master, in signing bills of lading, acted as the agent of the charterer, but as between the shipowner and the shipper he was the agent of the owner, who appointed and paid him, and who, in not allowing the ship to start on the voyage from New York, obeyed the orders given him by the owner whose agent he continued to be.

"In every contract of affreightment, whether by charter party or bill of lading, the ship is by the admiralty law hypothecated to the shipper for any damage sustained by his goods through the failure of the ship to transport them in safety to their destination—the injuries not being occasioned by the expected perils."

It is significant that in the present case the master was both appointed and paid (and the crew was also paid) by the Fleet Corporation, which, for present purposes, is the government. Furthermore, clause 20 of the charter provides that the charterers shall cause all bills of lading issued to contain the usual exemptions and stipulations for the trade, and particularly a "Jason" clause, a war clause, and a general average clause, similar to clauses 17, 18, and 19 of the charter party, and also that the bills of lading make the carriage subject to the provisions of the Harter Act (46 USCA §§ 190–195). If the government, as owner of the vessel, did not in fact intend that it would be bound by bills of lading signed by the master, these provisions are mere sur-

plusage. We cannot assume that they were not inserted for a purpose. Such cases as The Poznan (D. C.) 276 F. 418, are not in point, since in those cases the bills of lading were actually signed by the charterers, who, under the charter parties, were the only ones required to sign.

■ Even should we apply the narrower English rule, we must reach the same result, because, the master being the owner's servant and having authority to sign the bills of lading, the owner is bound by such bills where the shipper has no actual knowledge of the fact that the master, by terms of the charter party, has no such authority; that is to say, even though it be assumed that under the charter the master, in signing the bills of lading, was acting for the charterer only, nevertheless the United States government, the owner of the Balosaro, is bound to the present libelant under the bills of lading, because it does not appear that libelant had any knowledge of the charter party or of its terms, and therefore it had a right to assume, applying the English doctrine, that the master was the general agent of the shipowner, and had general authority to sign the bills of lading on its behalf. See Carver on Carriage of Goods by Sea (7th Ed.) §§ 154–157, and cases therein cited.

Again, the doctrine laid down in the case of The Galileo (Earle & Stoddart v. Ellerman's Wilson Line), 287 U. S. 420, 53 S. Ct. 200, 77 L. Ed. 403, is clearly not applicable here. There, the inquiry was not whether there was a "personal contract," but as to the effect of the express incorporation of the fire statute in the bill of lading. The fact that in the present case the bills of lading are printed on forms bearing the name of the Pacat Steamship Corporation, who are the operating agents of the charterer, is not material, in view of the personal signature of the master and the well-defined law governing his responsibility with respect to the vessel's owner. There being no proof that the libelant, the shipper, had any knowledge that the vessel was chartered, a fortiori there is no proof that the Pacat Steamship Corporation was the charterer's agent or representative. From all that appears, the shipper had no intimation that the Pacat Company was not the owner's agent. Thus, also, the fact that the bills of lading contained such words as "the carrier" and "this line" is unimportant.

Having thus found that the United States, as owner of the Balosaro, cannot escape liability by virtue of the character of the signature on the bills of lading, we now come to the question of the extent of the government's liability, if any.

The government contends that its liability, if any, is limited by paragraph 5 of the bill of lading (already quoted); that is to say, that any liability imposed upon it must be limited to $51,723.32, which, it is stipulated, is the correct amount if paragraph 5 controls.

■ Assuming that the Balosaro was unseaworthy upon leaving Puerto Cabello, Venezuela (a question which will shortly be discussed), such does not of itself necessarily preclude the carrier—the government—from the advantage of clauses in the bills of lading if otherwise valid, which limit its liability. See The Caledonier (C. C. A.) 31 F.(2d) 257, certiorari denied, Picard v. The Caledonier, 279 U. S. 865, 49 S. Ct. 480, 73 L. Ed. 1003. Although a much higher value is actually written on the bills of lading ($691,600), no higher rate of carriage was actually paid. Both the bills of lading and the stipulation make no mention of any freight rate, prepaid or to be collected; and, therefore, with the total absence of any evidence that a rate higher than the usual one was understood to apply, it is accepted as a fact that there was no understanding as to a higher rate. Libelant's contention is that, because the limitation of liability in the second sentence of article 5 (above quoted) is not expressly conditioned on the choice of rates recited in the first sentence, it is void; in other words, that the second sentence must be interpreted as if it stood alone, unqualified by anything in the preceding sentence, and that so interpreted it is invalid; and that therefore the entire article 5 is invalid. But the second sentence of paragraph 5 is qualified by the first, and we believe that the correct meaning of paragraph 5, in view of the valuation written into the bills of lading, which was very much greater than $250.00 a ton (nearly three times as great, in fact, on the basis of slightly more than 988 tons— that is, $681,600 against $249,000), is that, although the value exceeded $250 a ton, and although the libelant had the option of paying a higher freight rate than it did pay and thereby making the carrier liable for a greater amount, it never negotiated for, or agreed upon, such higher rate, and there-

fore is to be considered as having elected to avail itself of the benefit of the lower freight rate, in consideration of which it is to be considered as having agreed with the representative of the vessel's owner that $250 a ton should be the limit of the latter's liability. Thus interpreted, such a limitation is valid. See The Caledonier, supra; The Emden (G. W. Sheldon & Co. v. Hamburg Amerikanische, etc.), 28 F.(2d) 249 (C. C. A.).

Paragraph 12 of the bill of lading (quoted above), if applied, would allow much more than the amount allowable under paragraph 5. But paragraph 12, by itself, is invalid because it limits liability to cash value of the goods at port of departure at time of shipment, without offering a choice of rates. See The Merauke (C. C. A.) 31 F.(2d) 974. However, this paragraph can and, we think, should be struck down without the other provisions in the bill of lading becoming void also, since it is capable of separation. See American Railway Express Co. v. Lindenburg, 260 U. S. 584, 43 S. Ct. 206, 67 L. Ed. 414; The Ansaldo San Giorgio I v. Rheinstrom Brothers Co., 294 U. S. 494, 55 S. Ct. 483, 79 L. Ed. 1016.

That the documents covering a cargo of such size and value could be issued in such incomplete state, with omissions and absurdly ambiguous and contradictory clauses, shocks the average person's sense of businesslike methods. But the parties to such documents are presumed to know, and are bound by, their provisions, and courts must interpret them, as best they can, in the light of established principles.

The libelant raised the further point that, granting this interpretation of the bills of lading to be correct with respect to the limitation of liability provisions therein contained, such defense nevertheless cannot now be raised, because not properly pleaded. However, we think this is without merit. Suffice it to point out that the bills of lading were made a part of the answer.

Having thus found that clause 5 of the bills of lading is a valid provision, we now revert to the facts in order to determine its application thereto; that is to say, we must now decide (1) whether the Balosaro was in fact unseaworthy; and (2) if so, whether the government has thereby become liable under clause 5 of the bills of lading, or whether, as libelant contends, the government's liability is not thus limited, but is in effect that of an insurer.

First, we find that the Balosaro was unseaworthy upon leaving Puerto Cabello, and that due diligence had not been exercised to make her seaworthy. The vessel was new—it was her maiden voyage. She should have steamed from Mobile to Puerto Cabello in about 8 days, but she actually took 17, although practically no heavy weather was encountered. She was stopped repeatedly for repairs and at no time approximated normal speed. On one day she actually lost 36 miles. While lying at Puerto Cabello a survey was made of the vessel's engine, boilers, and machinery, but there is no adequate proof that the repairs that followed as a result of this survey were properly made, or, even if so, that they placed her in a condition to proceed without more. The rest of the voyage to Havre was even more interrupted by breakdowns, necessitating repeated stops at sea and repairs at the Virgin Islands and the Azores, with the result that, whereas the entire voyage from Puerto Cabello to Havre, including loading at Guadeloupe, should have been made in 40 days, it actually consumed nearly 5 months.

Second, the Balosaro was inadequately officered upon leaving Puerto Cabello. At the master's request, the chief, first, second, and third assistant engineers were replaced at St. Thomas, and it is stipulated that he considered them incompetent when the vessel left Puerto Cabello.

Third, the stowage was extremely negligent, in that the leaky casks of rum should not have been placed above the hides.

Fourth, the inordinate delay in the voyage, due to the vessel's unseaworthiness, resulted in making the deterioration of the hides due to improper stowage of the rum greater than it would otherwise have been.

Fifth, we find that the extraordinary and unwarranted length of time which it took the Balosaro to complete her voyage amounted to a legal deviation.

The law applicable to the first four of these findings is so firmly established as scarcely to require citation of authorities. The owner, acting as a common carrier, as was the government in the case of the Balosaro, must use due care to furnish (1) a seaworthy vessel; (2) a vessel that is

fully manned by competent officers and crew; (3) a vessel that is suited and equipped to carry the particular type of cargo; and (4) must also use due care in the loading, stowing, and care of the cargo. In the present case, both the charter party and the bills of lading incorporated the Harter Act (46 USCA §§ 190–195), which expressly puts these obligations on the vessel. See May et al. v. Hamburg-Amerikanische, etc., 290 U. S. 333; Luckenbach v. McCahan Sugar Co., 248 U. S. 139; Knott v. Botany Worsted Mills, 179 U. S. 69, 21 S. Ct. 30, 45 L. Ed. 90; The Agwimoon˙ (Atlantic Gulf & West Indies S. S. Line v. Inter-Ocean Oil Co.), 31 F.(2d) 1006 (C. C. A.); Id. (D. C.) 24 F.(2d) 864; certiorari denied Id., 279 U. S. 874, 49 S. Ct. 514, 73 L. Ed. 1003. Incompetency of officers may amount to unseaworthiness. See Hartford & New York Transportation Co. v. Rogers & Hubbard Co. (C. C. A.) 47 F. (2d) 189, and cases therein cited. The government has failed to meet all of these obligations.

With respect to the fifth and last of the above enumerated findings, that is, that the extraordinary and unwarranted length of time consumed on the voyage amounted to a legal deviation, which is a conclusion of law, we rely upon the well-established rule that the principles of a legal deviation are not necessarily limited in their application merely to an actual, physical deviation outside the usual route of the voyage. See The Malcolm Baxter Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901. In that case, there was involved a shipment from New Orleans to Bordeaux, France, commencing July, 1917, on the schooner Malcolm Baxter, Jr. After departure from New Orleans, the Baxter developed leaks due to unseaworthiness, which caused her to put in at Key West, where she was surveyed. She was then towed to Havana, where she was unloaded and repaired, remaining there for that purpose until January 14, 1918. Before the completion of these repairs, the Baxter was prevented from obtaining clearance for Bordeaux on account of an embargo which had been put into effect by the United States Export Administrative Board, because of the World War. This embargo remaining in effect after the repairs were completed, the Baxter took her cargo again on board and proceeded to New York, where the petitioners libeled her for the purpose of recovering the freight money, damages to cargo, and damages for failure to perform the contract voyage from New Orleans to Bordeaux.

Affirming the decree of the Circuit Court of Appeals for the Second Circuit [The Malcolm Baxter Jr., 20 F.(2d) 304] that there could be no recovery for the prepaid freight, but only for actual damages to the cargo on the basis of the difference between its value had it arrived at destination on a straight voyage, had there been no interruption, and its value if it had arrived after the deviation, the Supreme Court said (277 U. S. 323, page 331–333, 48 S. Ct. 516, 517, 72 L. Ed. 901):

"Unseaworthiness alone, or deviation caused by it, displaces the contract of affreightment only in so far as damage is caused by the unseaworthiness. The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644; The Europa (1908) p. 84; Thorley v. Orchis S. S. Co., Ltd., (1907) 1 K. B. 660; Kish v. Taylor (1912) A. C. 604, 618. But if the deviation here is to be classed with voluntary deviations, respondent may not claim the benefit of the clauses of the bill of lading and is responsible for the cargo as insurer. The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491; St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral, etc., 263 U. S. 119, 44 S. Ct. 30, 68 L. Ed. 201; Mobile & Montgomery Ry. v. Jurey, 111 U. S. 584, 4 S. Ct. 566, 28 L. Ed. 527; Lawrence v. Minturn, 17 How. 100, 15 L. Ed. 58. And see The Indrapura (D. C.) 171 F. 929. In any case it is contended that respondent's negligent failure to discover the unseaworthiness of the vessel resulted in the delay which brought her within the operation of the embargo, and that the shipowners are for that reason liable for damages for all the delay, including that immediately resulting from the embargo. * * *

"But here the deviation was not voluntary and the point to be determined is whether a like effect is to be given to a deviation to avoid perils of the sea where the deviation would not have been necessary if the owner had used reasonable diligence to start the voyage with a seaworthy vessel.

"No sufficient reason is suggested to us for thus extending the rule, nor do we perceive any. Petitioner, without resort to it, is entitled to recover all damages caused by the unseaworthiness. The basis of the

privilege of deviation to avoid perils of the sea is humanitarian. See Carver, Carriage by Sea (7th Ed.) §§ 291, 292. To hold that the master whose ship is in a perilous position must choose between the hazard of continuing the voyage and gaining safety only by forfeiting the contract of affreightment would be a departure from that principle for no purpose except to give the shipper an added and unnecessary protection. 'It is the presence of the peril and not its cause' which justifies the deviation. See Strang v. Scott, 14 App. Cas. 801. This is the conclusion reached in other circuits (The Turret Crown (C. C. A.) 297 F. 766; The Turret Crown (C. C. A.) 284 F. 439, 445; The Turret Crown (D. C.) 282 F. 354, 360; see The Thessaloniki (C. C. A.) 267 F. 67), and by the House of Lords in Kish v. Taylor, supra, holding that a deviation caused by unseaworthiness due to improper and negligent loading of the ship by the master did not displace the bill of lading. This rule we adopt as most consonant with the reason and consequences of the rule that a voluntary deviation displaces the contract of affreightment. It follows that the clauses of the bill of lading remain effective and that petitioner may not recover the freight money. Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U. S. 377, 39 S. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15.

"But for all damages legally attributable to the breach of warranty of seaworthiness petitioners may recover. The Caledonia, supra."

█ Libelant in the present case seeks to rely upon an earlier decision of the Supreme Court, namely, Willdomino v. Citro Chemical Co., 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491, but, as will be seen from the above quotation from the opinion in the case of The Malcolm Baxter, Jr., the deviation of the Willdomino was voluntary, as opposed to an involuntary one in the case of The Malcolm Baxter, Jr. And so, in the present case, while we find that the extraordinary and unwarranted delay of the Balosaro constituted, in legal contemplation, a deviation, it is clear that such deviation was of the involuntary, and not the voluntary, sort, thus bringing it within the ruling of The Malcolm Baxter, Jr., supra, and not of the Willdomino, supra. Paraphrasing slightly part of the language in The Malcolm Baxter, Jr., quoted above, the master of the Balosaro found her in a

perilous position, due, it is true, to failure to make her seaworthy before commencing the voyage, but this did not require him to choose between the hazard of continuing the voyage and obtaining, or trying to obtain, safety through repairs only by forfeiting his contract of carriage.

Libelant also stresses a still earlier case in the Supreme Court, namely, St. Johns N. F. Shipping Corp. v. Companhia Geral, etc., 263 U. S. 119, 124, 44 S. Ct. 30, 31, 68 L. Ed. 201, where rosin was stowed on desk and jettisoned during the voyage to relieve the vessel in a storm, and where it was held that the vessel was liable as for a deviation, the court saying:

"We are not dealing with a case arising under a general port custom permitting above deck stowage notwithstanding a clean bill, with notice of which all shippers are charged. When there is no such custom and no express contract in a form available as evidence, a clean bill of lading imports under deck stowage. The Delaware, 14 Wall. 579, 602, 604, 605, 20 L. Ed. 779. Upon this implication respondent had the right to rely. To say that the shipper assented to stowage on deck is not correct. It gave the vessel an option, and the clean bill of lading amounted to a positive representation by her that this had been exercised and that the goods would go under deck.

"By stowing the goods on deck the vessel broke her contract, exposed them to greater risk than had been agreed and thereby directly caused the loss. She accordingly became liable as for a deviation, cannot escape by reason of the relieving clauses inserted in the bill of lading for her benefit, and must account for the value at destination. Generally, the measure of damages for loss of goods by a carrier when liable therefor is their value at the destination to which it undertook to carry them. Lawrence v. Minturn, 17 How. 100, 111, 15 L. Ed. 58; Mobile & Montgomery Ry. Co. v. Jurey, 111 U. S. 584, 596, 4 S. Ct. 566, 28 L. Ed. 527; New York, L. E. & W. R. R. Co. v. Estill, 147 U. S. 591, 616, 13 S. Ct. 444, 37 L. Ed. 292; Chicago, M. & St. P. Ry. Co. v. McCaull-Dinsmore Co., 253 U. S. 97, 100, 40 S. Ct. 504, 64 L. Ed. 801; Royal Exchange Shipping Co. v. Dixon, 12 A. C. (1887) 11; The Sarnia (C. C. A.) 278 F. 459; 3 Hutchinson on Carriers, § 1360; Carver on Carriage of Goods by Sea (6th Ed.) § 287."

It will be seen that the facts in the St. Johns N. F. Shipping Corporation Case bring it within the type of voluntary and not involuntary deviation, and therefore it is not controlling of the present situation.

Finally, having found that the deviation of the Balosaro did not vitiate valid clauses in her bills of lading, and having found that clause 5 in these bills is valid, it follows that the government is liable for the damages computable thereunder, which, it is stipulated, amount in the aggregate to $51,723.32. We are thus relieved of the obligation to compute the damages, and find the government liable to libelant for this amount. Libelant claims interest, and the Suits in Admiralty Act permits its allowance, in the discretion of the court, at the rate of 4 per cent., from the time of bringing suit (which in the present case was December 29, 1932) until the decree or judgment is satisfied. 46 U. S. Code, §§ 743 and 743a (46 USCA §§ 743, 743a). Interest will be so allowed.

A decree will be signed in accordance with this opinion.